THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| GRAHAM - FIELD, INC., et al.<br><br>Plaintiffs<br><br>Vs<br><br>E-1 Enterprises, Inc., et. al.,<br><br>Defendant | CIVIL NO. 98-1306 (DRD)<br>CIVIL ACTION |

**BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT - LAW 75**

TO THE HONORABLE COURT:

COMES NOW defendant E 1 Enterprises, Inc. ("E1"), represented by the undersigned attorney, and most respectfully STATES, ALLEGES and PRAYS:

*(A) Introduction.*

At the outset, it is important to note that Law 75 was not intended to prevent termination of unworkable relationships, but only to prevent arbitrary terminations. See R.W. Int'l Corp. v. Welch Food, Inc., 88 F.3d 49, 53(1st Cir. 1996). (*Found "just cause" for termination when a dealer sold competing products*.)

Puerto Rico's Law 75 governs the business relationship between principals and the locally appointed distributors who market their products. See: Irvine v. Murad Skin Research Labs., Inc., 194 F.3d 313, 317-18 (1st Cir. 1999). In order to avoid the inequity of arbitrary

termination of distribution relationships once the distributor has developed a local market for the principal's products or services, Law 75 limits the principal's ability to unilaterally end the relationship except for "just cause." P.R. Laws Ann. tit. 10, § 278a. The protection afforded to distributors under Law 75 was extended in 1996 to include the conduct of a principal "<u>detrimental to the established relationship</u>." P.R. Laws Ann. tit. 10, § 278a. <u>Caribe Industrial System, Inc. v. National Starch</u>, 212 F.3d 26, 29 (1st Cir. 2000); see also <u>Irvine</u>, 194 F.3d at 317-18. **"Established relationship" being the operative words**.

Not all commercial relationships are protected by Law 75. Rather, before invoking the remedies provided by the statute, a court must first determine whether the commercial relationship at issue constitutes a "dealer's contract" within the meaning of § 278(b).[1] <u>If there is no "dealer's contract," there is no Law 75 liability</u>. The first and most important issue before this Court is whether or not there was a "dealer's contract" between the parties. If there was none, then the case should be summarily dismissed.

### *(B) There was no "dealer's contract" between the parties.*

"The 'established relationship' between dealer and principal is bounded by the distribution agreement, and therefore the Act only protects against detriments to contractually

---

[1] This Court has held before that Law 75 does not prevent a supplier from establishing a wholly-owned subsidiary as an additional distributorship in Puerto Rico where a non-exclusive distributor was already operating even if the existing distributor suffered an economic harm as a consequence of said action. <u>Innovation Marketing v. Tuffcare. Inc.</u>, 31 F. Supp. 2d 218(D. Puerto Rico 1998) (applying the holding in *Vulcan Tools* within a Law 21 context). A supplier is free to create a wholly-owned subsidiary to distribute products where a non-exclusive distributor already exists.

acquired rights." (citation omitted). <u>Vulcan Tools of Puerto Rico v. Makita U.S.A., Inc.</u>, 23 F.3d 564, 569 (1st Cir. 1994). If there has been no impairment of the terms of the contract, there is no Law 75 liability. *Id.*

Although non-exclusive distributors are entitled to protection under Law 75, Law 75 does not operate to convert non-exclusive distribution contracts into exclusive distribution contracts. <u>Borschow Hospital and Medical Supplies, Inc. v. Cesar Catillo. Inc.</u>, 96 F.3d 10 (1st Cir. 1996) (citations omitted). Law 75 protects supplier-distributor relationships, but does not pamper distributors into acquiring rights that they have never possessed to begin with. <u>Caribe Industrial System, Inc. v. National Starch</u>, 36 F. Supp. 448, 452 (D. Puerto Rico 1999).

The Puerto Rico Supreme Court has further defined the dealer/principal relationship as one of "continuity, stability, mutual trust, coordination between parties as independent entrepreneurs, devoid of hierarchical subordination, and in whom [plaintiff] has made a substantial investment."<u>Chemorganics, Inc., Kemwater North America, Inc., et al.</u>, 49 F. Supp. 2d 62, 66 (D. Puerto Rico 1999) *citing* <u>J. Soler Motors, Inc. v. Kaiser Jeep International Corp.</u>, 108 D.P.R. 134, 142 (1978).

This District also held that "a dealer cannot be defined by the activity of promoting merchandise and creating a market alone." *Id. citing* <u>Gonzalez v. Brown Group, Inc.</u>, 628 F. Supp. 436, 440 (D. Puerto Rico, 1985). Promoting merchandise is not enough.

In light of the above-cited criteria we must then determine the following:

1. What was the agreement, if any, between plaintiff Graham Field and Tuffcare?

2.	To what products did the VC Agreement apply?

3.	Was plaintiffs' promotion of its own line of competing products detrimental to Tuffcare?

It is the uncontested testimony of <u>all</u> the signatories of the VC Agreement that it was limited to <u>wheelchairs</u>. All the people involved in the Tuffcare - VC Medical relationship have stated that (1) the VC Agreement was limited to <u>wheelchairs</u> and that (2) VC Medical **never bought beds** from Tuffcare.[1]

The VC Agreement was then <u>terminated</u> at the request of Graham Field. Plaintiff demanded the termination of the VC Agreement because, as it stood, would prevent Graham Field from introducing its competing Celtylite and Everest & Jennings wheelchairs.[2] Graham Field was "afraid that it could be a ... problem in the future with introducing these products (wheelchairs) in the island."[3]

Towards that end, Tuffcare and VC Medical **terminated** the VC Agreement by letter dated August 13, 1996.[4] The letter specifically stated that they thereby "terminate[d] the Exclusive Sales Agreement between VC Medical Distributors and Tuffcare signed in October 1990. Both company (*sic.*) will continue to do business at goodwill." That is, "Tuffcare agreed to sell the same products as before, **but not on an exclusive basis**."[5] [Emphasis added.] Therefore, Tuffcare agreed to continue selling its products to VC Medical on a non exclusive basis ("**the non exclusive *arrangement***"[6]).

**At the time GFE bought the assets of VC Medical, there was no exclusive agreement of sales between VC and Tuffcare.**"[7]

In response to VC Medical's petition,[8] on August 27, 1996 Tuffcare consented to the assignment of its <u>non exclusive *arrangement*</u> with VC Medical to GFE upon the closing of the sale of assets, pursuant to all the terms and conditions of the original agreement (net 10 days, minimum purchases of wheelchairs).[9] In its August 27, 1996 letter Tuffcare specifically confirmed "that the Exclusive Sales Agreement is no longer in effect, and both company (*sic.*) will continue to do business at goodwill."

In his deposition Mr. Guzman described this <u>new</u> relationship as an "open relationship." GFE could continue to buy from Tuffcare on a non exclusive basis while at the same time GFE could sell its own competitive products.[10]

The above cited testimony is <u>uncontested</u>. There was no "dealer's contract."

Once Graham Field Express bought the assets of VC Medical, it continued ordering the same products from Tuffcare that VC Medical had previously done. Graham Field Express' former <u>president</u>, Mr. Vicente Guzman, stated that GFE's purchases were done on a non exclusive basis.[11] Furthermore, contrary to Plaintiffs' assertions, this was not done in a good faith effort to continue as Tuffcare's non-exclusive distributor in Puerto Rico.

GFE kept purchasing Tuffcare products in a transition period, only as a back up,[12] whereupon GFE bought less and less from Tuffcare for three main reasons:[13]

1. Provide enough competition free time while GFE introduced into the Puerto Rico market competing lines from Graham Field, such as the Everest & Jennings wheelchairs;[14]

2. Convince Tuffcare that it did not need to establish a direct distribution in Puerto Rico

of its products;[15]

3. Need to supply with other manufacturer's products due to Graham Field's inadequacy in filling GFE's orders completely and on time.[2], [16]

It is not as if Graham Field did not endeavor to create a favorable market for defendant's product in Puerto Rico. Graham Field limited its activities to using defendant's product for a brief transition period, in clear detriment of defendant's future position in the market. (*See:* Chemorganics, Inc. v. Kemwater North America, Inc., 49 F. Supp. 2d 62, 66

---

[2]See Exhibit 14. In the memorandum Vicente Guzman wrote to Irwin Selinger dated December 3, 1997, Guzman stated the following:

> As I mentioned to you before **we are decreasing our orders** in the regular wheelchairs. **Now, we are changing this to Everest & Jennings products** ... We went out of stock with the Everest & Jennings and **we can get Tuffcare's products faster** because they come from Florida and Everest & Jennings products come from Missouri. So by the time Everest & Jennings Wheelchairs are in (*sic.*) the way from Missouri we will have a wheelchair available in case one of our special customers order that specific item.
> ...
> The quad canes: everytime (*sic.*) we place an order of quad we never receive the quantities that we need. We ordered the GF 5986-4 at $28.20cs; they don't have enough and they sent me a substitute, the GF5796-4 at $32.28cs.
> ...
> In Tuffcare's containers we have space on top of the chairs. Because of the situation that we are having with GF's quad canes I decided to fill the empty space with 24 Tuffcare's quad canes with no special freight charges, **just to have a quad cane available in our warehouse**. <u>**I don't have any special interest in Tuffcare's products. I'm just making the products available. For these cases, if you have another vendor that I can use instead of Tuffcare let me know**</u>.
> ...
> **The <u>only reason</u> that I use Tuffcare is because it is the other option that I have to have products available**. If I have the availability of the products when I order, **I will not have any reason to order from anybody**. <u>I don't consider this a poor business decision</u>. We are just thinking of the availability of the products to our customers. [Emphasis added.]

( D. Puerto Rico 1999) (*J. Casellas found that plaintiff was not a "dealer" because it limited its activities to selling defendant's product to its main competitor on the Island, in clear detriment of defendant's future position in the market.*)

It is the law of this Circuit that a conflict of interest exists when a dealer sells competing products. This conflict of interest, if material to the principal, constitutes just cause for termination. Welch Food, Inc., 88 F.3d at 53. It is undisputed that plaintiffs sold competing products.[17]

Plaintiffs argue that the August 27, 1996 "non exclusive *arrangement*" allowed GFE to sell its own competing products in Puerto Rico while at the same time provided them with the exclusive distribution rights of Tuffcare's products in Puerto Rico (thus, forbidding Tuffcare from selling its own products in Puerto Rico).[18] GFE's conflict of interest is crystal-clear. Law 75 does protect a relationship where one party can sell competing products and at the same time prevent its competitor from directly selling its own products. If this were allowed, the first company could destroy the business of the second company. This should be the end of plaintiffs' Law 75 claim.

This conflict of interest was recognized by Judge Domínguez at the Hearing on Request for Preliminary Injunction. See: ***page 3 of exhibits, line 9***. (This Court found plaintiffs' request to be Tuffcare's exclusive dealer, while at the same time it sold competing products, to be irreconcilable.)

Considering that the dealer-distributor relationship is "characterized by the cooperation, stability, and mutual trust it generates," plaintiffs' behavior could hardly reflect

such a relationship.  Plaintiffs' attempt to promote its own competing lines at Tuffcare's expense goes against the very essence of a dealer - distributor relationship.  Although no single factor is deemed to be conclusive, both the creating of a favorable market and the gaining of consumers for a product or a service, have been regarded as the two most salient criterion in identifying a dealer under § 278.  Triangle Trading Co. v. Robroy Industries Inc., 952 F. Supp. 75, 77 (D.P.R. 1997).  It is impossible to imagine how plaintiff's promotion of its own line of competing products & plot to stop buying from Tuffcare would support a finding that a relationship of "mutual trust" existed between the parties.

Again, it is not as if Plaintiffs did endeavor to create a favorable market for defendant's product in Puerto Rico. Quite the contrary, GFE limited its activities to selling its own competing products in clear detriment of defendant's future position in the market.

Plaintiffs' actions should come at no surprise.  At the same time plaintiffs were plotting to drive Tuffcare out of the Puerto Rico market, Irwin Selinger falsified documents to manipulate and inflate plaintiff's stock price. Mr. Selinger also included false information in Graham Field's SEC Form 10-Q for the quarter ended September 30, 1997.[19]  On October 30, 2002 the United States charged Mr. Selinger with securities fraud. (See Exhibit 23.) Mr. Selinger was convicted on June 9, 2004.

### (C) Graham Field violated its duty of good faith.

Even assuming that Law 75 applies to GFE's non exclusive arrangement with

Tuffcare, the aforesaid actions of Graham Field would have violated the duty of good faith which it would have owed to the defendant. The requirement of good faith between the parties in a contract is one of the general requirements of the system of law in Puerto Rico. Said requirement must guide all contacts between the contracting parties during the existence of the relationship. An-Port, Inc., v. MBR Industries, Inc., 772 F. Supp. 1301, 1314 (D. Puerto Rico 1991), *citing* Velilla v. Pueblo Supermarket, Inc., 111 P.R. Dec. 585, 587-588 (1981).

The facts of this case clearly demonstrate that Graham Field breached the confidence and trust that Tuffcare deposited in it. There was an underlying bad faith motive behind GFE's dealings; to substitute Tuffcare's products with its own. Plaintiffs never exercised the required honesty, fidelity and good faith.

### *(D) The absence of a dealer's contract between the parties make plaintiff's arguments as to lack of just cause moot.*

Section 278(d) of Law 75 defines just cause as "any action or omission [by the dealer] that adversely and substantially affects the interests of the principal or grantor in promoting the marketing or distribution of the merchandise or service." [Emphasis added.]

Just cause is only an issue when the principal unilaterally terminates the distributor's contract with the supplier or acts to the detriment of the relationship "*as created and defined in the distributorship agreement*." Caribe Industrial System, 36 F. Supp. at 452. [Emphasis

in the original.] Thus, if there is no "distributor's contract," then "just cause" is not an issue.

### (E) Conclusion

We do not need to go any further. Plaintiffs' arguments (e.g. *difference in transfer prices between Tuffcare and MedEx v. prices offered to GFE, Tuffcare's alleged refusal to sell & termination*) assume that the "established relationship" between plaintiffs and Tuffcare was protected by Law 75. It was not. Plaintiffs must specify "material" facts that indicate that the "established relationship" was subject to law 75 protection before arguing that Tuffcare's alleged "termination" lacked "just cause."

Plaintiffs have no Law 75 claim against the original defendant in this case, Tuffcare. Much less against the appearing defendant E1.

I HEREBY CERTIFY that, on this same date, a true copy of this document has been sent via the Court's CM/ECF syatem to Mr. Kenneth J. Mc Culloch, Esq. RESPECTFULLY SUBMITTED.

Hato Rey, Puerto Rico, January 28, 2005.

/S/ Ignacio Fernandez de Lahongrais
IGNACIO FERNANDEZ DE LAHONGRAIS
USDC - PR 211603
Capital Center Sur, Suite 202
239 Avenida Arterial Hostos
Hato Rey, Puerto Rico 00918-1475
Tel. 787-758-5789 Fax 787-754-7504

## ENDNOTES

1.
See pages 7- 8 of exhibits. *Exhibit 8: Transcript of deposition given by Mr. Calvin Chang, lines 13 - 22.*

2.
See pages 7 and 13 - 14 of exhibits: Transcript of Hearing on Request for Preliminary Injunction, Mr. Vicente Guzman testifying. *See also*: page 73 of exhibits. Exhibit 5: Transcript of deposition given by Mr. Vicente Guzman, 12/27/2001, line 10.

3.
See page 8 pf rxhibits: Transcript of Hearing on Request for Preliminary Injunction, Mr. Vicente Guzman testifying, line 1.

4.
See Exhibit 11.

5.
See Exhibit 3: Sworn statement by Mr. Vicente Guzman, paragraph 9.

6.
See page 35 of exhibits: Transcript of Hearing on Request for Preliminary Injunction, Mr. Calvin Chang testifying, page 93, line 19.

7.
See page 24 of exhibits: Transcript of Hearing on Request for Preliminary Injunction, Mr. Vicente Guzman testifying, lines 1 - 11. See also: page 56 of exhibits: transcript of deposition given by Mr. Vicente Guzman, 12/20/2001, line 12.

8.
See Exhibit 12.

9.
See Exhibit 13.

10.
See page 83 of exhibits: Transcript of deposition given by Mr. Vicente Guzman, 12/27/2001, line 13.

11.
See Exhibit 3: Sworn statement by Mr. Vicente Guzman, paragraph 10.

12.
See Exhibit 7: Sworn statement given by Ms. Hilda Salgado, paragraph 8.

13.
See Exhibit 15. Memo from Mr. Vicente Guzman to Mr. Irwin Selinger dated September 23, 1997. (The "*smoking gun*.")

14.  *Id.*

15.  *Id.*

16.
See page 87 of exhibits: Transcript of deposition given by Mr. Vicente Guzman, 12/27/2001.  See also pages 87 - 90 of exhibits & pages 108 - 109 & 111 of exhibits.

17.
See Exhibit 22, plaintiffs' Response to admissions

18.
See Exhibit 19: Pre Trial Memorandum, paragraph 10.

19.
See page 254 of exhibits.  *Exhibit 21: Irwin Selinger's indictment*.