```
                IN THE UNITED STATES DISTRICT COURT FOR THE
                          DISTRICT OF PUERTO RICO


    GRAHAM-FIELD, INC., et al.,  )
                                 )
              Plaintiffs,        )
                                 )
    vs.                          )   CIVIL NO: 98-1306(DRD)
                                 )
    TUFFCARE, INC.,              )
                                 )
                                 )
              Defendants.        )
                                 )
```

HEARING ON REQUEST FOR PRELIMINARY INJUNCTION

BE IT REMEMBERED that the above entitled action came on for hearing before the HONORABLE DANIEL R. DOMINGUEZ, sitting at Hato Rey, Puerto Rico, on the 7th day of April, 1998.

APPEARANCES:

    For the Plaintiff:  Kenneth McCullock, Esq.

    For the Defendant:  Arturo Negron Garcia, Esq.

ARTHUR G. PINEDA, OCR
Federal Building, Rm. G-40
150 Chardon Avenue
Hato Rey, Puerto Rico 00918
(787) 766-4319

64

1  terminated.
2           MR. MCCULLOCK: Excuse me.
3           THE COURT: But that letter doesn't say otherwise
4  you're terminated.
5           MR. MCCULLOCK: There is another document that says
6  because you didn't answer that letter that's why you were
7  terminated. So, we'll get to that when Mr. Chang is finished
8  with the learned counsel for the defendant.
9           THE COURT: Okay. But there is in here, in this case a
10 taint of plaintiff wanting to maintain an exclusive relationship
11 while at the same time selling competing products.
12          And that, sir, is very difficult under the Law 75,
13 unless, prior to the relationship, you were doing it. And here
14 it doesn't sound that way. And here it doesn't sound that way at
15 all. But let's see where we go. Let's see where we go.
16          And I must say, that that has already been decided
17 either by this Court or by the Supreme Court, the fact that
18 selling competing products may cause a termination.
19          MR. MCCULLOCK: Your Honor, this is the first time
20 that's being raised in any kind of correspondence of any kind.
21          THE COURT: Fine. Fine. Let's go. Let's see where it
22 take us.
23 By MR. NEGRON GARCIA:
24 Q    Mr. Chang, while you were making -- doing business with
25 Mr. Guzman, and before Mr. Guzman asked you to terminate the

3

1  have all day. It's six o'clock and I work very late, but I'm not
2  going to stay here until one o'clock at night. So, let's see how
3  we move this on.
4          MR. NEGRON GARCIA: Our first witness will be
5  Mr. Vicente Guzman, Junior.
6          THE COURT: Please have Mr. Vicente Guzman, Junior --
7  do we need a translator?
8          MR. NEGRON GARCIA: Yes, Your Honor.
9          THE COURT: Now, here are the ground rules of this
10 hearing so we all understand what the ground rules are.
11         I am going to give you a reasonable hearing, but
12 reasonable is reasonable. All right. Reasonable is we're not
13 going to stay here until two o'clock in the morning. You're
14 going to go directly to what is important.
15         This is only a preliminary hearing, both of you,
16 this is a preliminary hearing. This is not the merits of the
17 case. All right. Thank you.
18                VICENTE GUZMAN, JR.,
19 after having been first duly sworn to state the truth,
20 the whole truth and nothing but the truth testified
21 through the Interpreter as follows:
22                DIRECT EXAMINATION
23 By MR. NEGRON GARCIA:
24 Q    Sir, will you state -- please, will you state your name sir.
25 A    Vicente Guzman.

4

10

1  Q    Mr. Vicente Guzman, will you kindly tell the Honorable Judge
2  your relation with V.C. Corporation.
3  A    I was the president of V.C. Corporation until Graham-Field
4  acquired the assets of same.
5  Q    Will you kindly state your relationship before Graham-Field
6  bought your corporation, what was your relationship, if any, with
7  Tuffcare Incorporated?
8  A    I was a distributor for the products of Tuffcare in Puerto
9  Rico.
10 Q    Yes, since when did you distribute their products in Puerto
11 Rico?
12 A    Since 1990.
13 Q    With whom did you dealt in Tuffcare Incorporated and you
14 made business with, if any particular person?
15 A    With Mr. Calvin Chang and Joseph Chang.
16 Q    Is Mr. Calvin Chang present here in court this afternoon?
17 A    Yes.
18 Q    Will you be so kind as to point to him, for the record.
19         THE COURT: Any objection thereto, that he has
20 identified Mr. Joseph -- Calvin Chang.
21         MR. MCCULLOCK: No, Your Honor.
22         THE COURT: Okay. Very well. Thank you.
23              You may proceed.
24         MR. NEGRON GARCIA: Showing -- I would like the -- I
25 would like these marked.

5

11

```
 1            THE COURT:  Have you shown it to Brother Counsel?
 2            MR. NEGRON GARCIA:  I haven't shown it.
 3            Your Honor, for the record I'm showing Brother
 4   Counsel five different copies -- copies of five documents that we
 5   would try to introduce into evidence now.
 6   By MR. NEGRON GARCIA:
 7   Q    Mr. Guzman, if you could be so kind, can you tell the Court
 8   what is being shown to you?
 9   A    This was the initial agreement that I signed with Mr. Calvin
10   Chang.
11   Q    Who are the parties to that contract?
12   A    Calvin Chang, Vicente Guzman and Hilda Delgado -- Salgado.
13   Q    Mr. Guzman, were there any other agreements between you and
14   Tuffcare, written agreement, as to the nature of your commercial
15   relationships?
16   A    No.
17   Q    Am I correct in stating that this was the sole agreement
18   written agreement between your corporation and Mr. Chang's
19   corporation, Tuffcare?
20   A    As a sales agreement, yes, this would be the only one.
21   Q    That was the only agreement, basically, except the ordering
22   and the selling and the buying of your product, but as an
23   agreement between the parties as to the nature of the agreement
24   this was the only written agreement?
25   A    Yes.
```

14

1  MR. MCCULLOCK: I object.

2  THE COURT: Okay. Give me the reason.

3  MR. MCCULLOCK: I object because there is no foundation
4  laid for the question, and it calls for hearsay speculation.

5  THE COURT: Okay. Sustained. Rephrase.

6  MR. NEGRON GARCIA: Yes, Your Honor.
7  By MR. NEGRON GARCIA:
8  Q    What is this document, Mr. Guzman?

9  MR. MCCULLOCK: Objection, Your Honor, the document
10 speaks for itself.

11 THE COURT: No, overruled.

12 THE WITNESS: This document as far as the different
13 things that were requested by Graham-Field when they bought my
14 company.

15         They asked me that I should terminate the
16 exclusive agreement, as important for the sale to take place.
17 By MR. NEGRON GARCIA:
18 Q    Mr. Guzman, will you explain to the Honorable Judge what do
19 you mean by saying of the buying of Graham-Field of your
20 corporation, the conditions that they asked you, in relation to
21 this document?
22 A    They requested quite a lot of information which I had to
23 complete. And they demanded that I terminate the exclusive
24 agreement with Tuffcare because they had products that were in
25 competition.

1    And that they were afraid that it could be a future --
2    a problem in the future with introducing these products in the
3    island.
4    Q    Mr. Guzman, to be clear as to the facts. In the claim, that
5    you don't have a copy, it was stated that Graham-Field, Inc., the
6    plaintiff in this case, bought, at a certain point in time bought
7    V.C. Medical Distributor Corporation from you; is that correct?
8    A    Yes, Graham-Field bought the assets of my company V.C.
9    Medical Corporation.
10   Q    Okay. Sir, may we -- I'm sorry. I would submit three
11   documents just to speed this up, Your Honor.
12           THE COURT:  Fine.
13           MR. NEGRON GARCIA:  Brother Counsel has copy of these
14   documents. I.D. C, D and F, am I correct?
15           THE CLERK:  That's right.
16   By MR. NEGRON GARCIA:
17   Q    Let's take one at a time, Mr. Guzman, please. Showing you
18   I.D. C, which is dated August 17, what is that document?
19           Excuse me, before entering into the contents of the
20   document can you identify the signature in that document, please.
21   A    Yes.
22   Q    Whose signature is that?
23   A    Mine.
24   Q    Your signature please.
25           May I offer it as an exhibit Your Honor?

18

1  completed or consummated the selling of your company to
2  Graham-Field; am I correct?
3  A    That is correct.
4  Q    By any chance if any of these letters, that you know, from
5  personal knowledge by you, do you know for a fact if the people
6  from Graham-Field knew the contents of these letters?
7            MR. MCCULLOCK:  Objection, calls for speculation.
8            THE COURT:  It depends.
9            Let me hear the answer and I'll see what happens.
10 It depends on what his personal knowledge is.  Let's see.
11           MR. NEGRON GARCIA:  May I rephrase the question.
12           THE COURT:  You may.  Please rephrase.
13 By MR. NEGRON GARCIA:
14 Q    Mr. Guzman, do you show any of these letters to any people
15 from Graham-Field?
16 A    What happens is that practically just before the closing, as
17 I mentioned before, they required a series of documents and these
18 documents were practically prepared by them.  They gave me the
19 contents and I drafted it.
20 Q    Mr. Guzman, in regard to Exhibit E, did you turn that
21 letter -- did you give copy of that letter or did you show it to
22 any people from Graham-Field?
23 A    Yes.
24 Q    Was that -- and at the time, around the time that you were
25 signing -- you were selling your corporation to Graham-Field?

9

22

1  Graham-Field manufactures Everest and Jennings products. And
2  those products represent a competition for Tuffcare.
3           Mr. Irwin Salinger, the CEO for that company, on
4  several occasions questioned the fact that I was still buying
5  products from Tuffcare.
6           MR. MCCULLOCK: Objection. Not responsive and calls
7  for hearsay.
8           MR. NEGRON GARCIA: May I answer to that, Your Honor?
9           THE COURT: Hold it. Let me analyze the problem.
10           Okay. It's hearsay what the other person said.
11  Sustained. You are going to get the same thing by rephrasing the
12  question.
13           MR. NEGRON GARCIA: Yes. On the other hand, it should
14  be noted that at that point in time I'm discussing things within
15  the same corporation.
16           It's the same plaintiff. At that moment he was an
17  agent of that plaintiff. It could be interpreted that he's a
18  hostile witness identified with the plaintiff and I can even be
19  as leading as I want to.
20           And also, that what happened or pertained within
21  that corporation is the same corporation. It's not the
22  individual, because I'm not discussing now what happened between
23  them before he became a part of the plaintiff. But he's -- at
24  that point what I'm asking -- I'm not asking for things today.
25  I'm asking why he was a member of that corporation, and the

23

1  corporation is the plaintiff.  It's just one entity.
2          THE COURT:  Okay.  But anyway doesn't he have personal
3  knowledge of why the sales went down in his company?
4          MR. NEGRON GARCIA:  Well, he received orders and this
5  is why it's admissible, Your Honor.
6          THE COURT:  Fine.  On reconsideration, accepted.
7          MR. NEGRON GARCIA:  Thank you.
8  By MR. NEGRON GARCIA:
9  Q    Please answer.
10         Okay.  Mr. Guzman, by any chance while you were --
11 while V.C. had the exclusive agreement with Tuffcare, did you
12 sell any wheelchairs of any other brand?
13 A    No, exclusively Tuffcare.
14 Q    And in terms of your business of V.C. Medical how much did
15 the selling of the wheelchair entailed what percentage of the
16 volume of your sales?
17 A    It was approximately of forty percent.  Yes, wheel chairs
18 and Tuffcare products.
19 Q    But I want to be very clear, of those other products how
20 much does the wheel chair itself at that point in time is there
21 in sales.
22 A    About forty percent.
23 Q    Of your total sales.  Okay.  Thank you.
24         The fact is, Mr. Guzman, am I correct in stating that
25 when you sold your corporation -- or let's put it the other way.

```
                                                                    24
 1   When Graham-Field acquired the assets of your corporation there
 2   was no exclusive agreement of sales between you and Tuffcare?
 3   A    There was no agreement because that was what had been
 4   requested by the offices of Graham-Field.  Specifically,
 5   Mr. Richard Colon, who on several occasions asked me when this
 6   business of the letters with other suppliers was going to end.
 7   Q    And the reason was, am I correct in stating, that they
 8   wanted to rescind that part of the contract because they wanted
 9   for them to be able to sell other products, other wheel chairs
10   other than Tuffcare?
11   A    Yes, that was the main reason.
12           MR. NEGRON GARCIA:  I'm sorry, Your Honor, if any other
13   documents have not been presented in evidence, I don't know if --
14           THE COURT:  Well I have that you have A, B, C and E.
15           MR. NEGRON GARCIA:  If it's offered in evidence that
16   will be it.
17           THE COURT:  Very well.  Cross examination.
18                           CROSS EXAMINATION
19   By MR. MCCULLOCK:
20   Q    Mr. Guzman, I call your attention to Exhibit A, exclusive
21   sales agreement.  Do you have that in front of you?
22   A    No.
23   Q    Were you given a copy?
24           THE COURT:  One second.
25   By MR. MCCULLOCK:
```

1  Q    Now, it's true -- is it true that this was a sales agreement
2  that gave you the exclusive right to distribute for Tuffcare;
3  correct?
4  A    Yes.
5  Q    And this also gave Tuffcare the right to have you only
6  distribute to them; isn't that correct, according to paragraph
7  three?
8  A    Yes.
9  Q    So, this was a double exclusive?
10 A    Yes.
11 Q    And Graham-Field could not be -- agree to the provision that
12 restricted them from selling other products because they were --
13 competing products of Tuffcare -- because they were already
14 distributing products that could be considered competitive to
15 Tuffcare; correct?
16 A    Can you repeat the question, please?
17 Q    At the time you negotiated the sale of your company to
18 Tuffcare --
19          THE INTERPRETER:  Excuse me a moment.
20 By MR. MCCULLOCK:
21 Q    The sale of your company to Graham-Field, Graham-Field
22 already was selling lines of products that were competitive?
23 A    Could you repeat the question?
24 Q    Okay.  At the time you negotiated the sale of your company,
25 V.C. Medical to Graham-Field, Graham-Field was already

26

1  representing some lines of products that could be considered
2  competitive to the lines of products that Tuffcare had; correct?
3  A    Yes.
4  Q    Okay. And for that reason, Mr. Cologne could not just adopt
5  this whole agreement because this agreement provided that V.C.
6  Medical would only sell for Tuffcare and not sell anyone else's
7  products competitive against Tuffcare; is that correct?
8  A    Correct.
9  Q    And that's why Mr. Cologne asked you to send out the letters
10 to Tuffcare modifying the exclusive arrangement, correct?
11 A    Yes.
12 Q    And thereafter, after this -- incidentally, in the time
13 period subsequent to the -- let me withdraw that.
14        The sales of your company to Graham-Field and
15 Graham-Field Express took place on September 4th, 1996; correct?
16 A    That is correct.
17 Q    And the sale price was approximately 1.6 million dollars?
18 A    Approximately 1.9.
19 Q    Okay. And after the sale, assuming three and a half or four
20 months --
21        THE INTERPRETER: I'm sorry after the sale?
22 By MR. MCCULLOCK:
23 Q    After the purchase by Graham-Field, isn't it true that
24 Graham-Field went and bought more than two hundred thousand
25 dollars in products in the balance of 1996 to Tuffcare?

27

1  A    I don't remember the exact the number.

2  Q    Well, was this essentially in the range of two hundred
3  thousand dollars?

4       MR. NEGRON GARCIA:  We object, Your Honor.  The
5  plaintiff has specific -- the only thing they have to do is show
6  the witness -- it's not my witness, it's not my employee, so,
7  therefore, I'm not able.

8       I don't have to make a rough amount regarding the
9  amount that I used, but the number that he's asking from the
10 witness are the numbers that they have.  They should be able to
11 produce those specific numbers and to provide the Court with the
12 numbers.

13      THE COURT:  Overruled.
14 By MR. MCCULLOCK:
15 Q    You can answer the question.
16 A    I don't recall the exact amount.
17 Q    Okay.  I'm not asking you for the exact amount, do you know
18 an approximate amount, what the purchases were by Graham-Field
19 from Tuffcare in the balance of 1996?
20 A    What I do remember is that at that time, in relation similar
21 to the one with V.C. Medical was kept.
22 Q    Okay.  And that meant that during the balance of 1996,
23 Tuffcare sold only to V.C. Medical which was now Graham-Field,
24 correct?
25      MR. NEGRON GARCIA:  Objection.

1           THE COURT: Grounds?

2           MR. NEGRON GARCIA: Special amount. They have to

3    establish a basis. He's asking --

4           THE COURT: Sustained.

5    By MR. MCCULLOCK:

6    Q    Mr. Guzman, you recently testified that subsequent to the

7    acquisition the same kind of relationship with Tuffcare existed

8    as existed before the acquisition. What did you mean by that?

9    A    When Graham-Field bought the company, we had agreed that

10   Puerto Rico was going to be an independent market where we would

11   be able to sell products that would be competitive with theirs.

12          But there was going to be like a transition period when

13   we would be buying less and less of the competitive product and

14   introduce more from the line.

15   Q    Well, when you say as far as, insofar as Tuffcare was

16   concerned did you continue to be V.C. Medical now that it's owned

17   by Graham-Field, continue to be the only company in Puerto Rico

18   through which Tuffcare sold its products?

19   A    Yes.

20   Q    And in 1997 this relationship continued also up until at

21   least September or October where Tuffcare sold its product in

22   Puerto Rico through V.C. Medical which was now part of

23   Graham-Field, correct?

24   A    To the best of my understanding, yes.

25   Q    Now, when was the first time you realized that Tuffcare was

```
                                                              29
 1   going to try to sell their products in Puerto Rico other than
 2   through V.C. Medical or Graham-Field Express?
 3   A    On several occasions there had been communications between
 4   Mr. Chang and myself, and Tuffcare had the concern of how were we
 5   going to keep on selling the products as the first product of the
 6   company if the company manufactured Everest and Jennings.
 7            And it was understood that Graham-Field wanted to
 8   market Everest and Jennings.  That's when I realized that the
 9   business was being affected.
10   Q    Let me get specific.  In 1997, is it true that V.C. Medical
11   and Graham-Field purchased approximately five hundred thousand
12   dollars worth of products from Tuffcare?
13   A    It could be close to that.
14   Q    So, at what point in time, on what date, specific day or
15   month did you first learn that any Tuffcare products were being
16   sold in Puerto Rico other than through Graham-Field Express and
17   V.C. Medical?
18            MR. NEGRON GARCIA:  I'm sorry, Your Honor, objection.
19            Excuse me, Your Honor.  He hasn't established his
20   personal knowledge.  He said I heard.  This is typical hearsay.
21   If they have evidence as to that and documentation or whatever
22   they have to present that.
23            We are here answering your summons, your order to
24   show cause why they should not issue a preliminary injunction.
25   If they have evidence as to my client's endeavors they should
```

**17**

```
                                                                    30
 1   present it.
 2              THE COURT:  Sustained.
 3   By MR. MCCULLOCK:
 4   Q    Mr. Guzman, at the end of 1997, did you give notice of
 5   resignation to Graham-Field Express that you were resigning?
 6   A    Yes.
 7   Q    And at that time, about that time, did you talk to Hilda
 8   Salgado about her leaving Graham-Field Express and working for
 9   Medtex or Tuffcare?
10   A    I had spoken to Mrs. Hilda Salgado since 1995, about the
11   possibility of her retirement and I was notified in November that
12   she didn't want to continue working and that she was going to
13   retire.
14   Q    Specifically, did you tell her that Tuffcare was going to
15   set up an operation in Puerto Rico and it might be an opportunity
16   for her.
17   A    No.
18   Q    And just so we know who Hilda Salgado is.  Hilda is the one
19   who was your operations manager during the time you had V.C.
20   Medical; is that correct?
21   A    Yes.
22   Q    And that was for six years?
23   A    Yes, for approximately six years.
24   Q    And prior to that time she had worked for your father in the
25   medical supply business?
```

36

```
 1   used?
 2              MR. NEGRON GARCIA:  No, Your Honor, it's the same
 3   document.
 4              THE COURT:  Very well.
 5              MR. MCCULLOCK:  Could I have a copy?
 6              MR. NEGRON GARCIA:  I don't know if I have copy.  I
 7   think I gave you mine.
 8              MR. MCCULLOCK:  Okay.
 9              MR. NEGRON GARCIA:  That's the only one I have, Your
10   Honor.
11   By MR. MCCULLOCK:
12   Q    Mr. Guzman, you were still president at the time this
13   document was sent by Tuffcare to V.C. Medical and GFE Express,
14   correct?
15              THE INTERPRETER:  If he was present or employed?
16   By MR. MCCULLOCK:
17   Q    You were still president of Graham-Field Express at the time
18   this letter was sent, weren't you?
19   A    Yes.
20   Q    And you knew Calvin Chang from Tuffcare very well, didn't
21   you?
22   A    Yes.
23   Q    Now, did you have any communication with Mr. Chang about
24   this letter after you received it?
25   A    Yes.
```

19

37

```
 1   Q    And when did you have that communication?
 2   A    I don't recall the exact date, but I do know we spoke about
 3   that letter.
 4   Q    Did you speak to Mr. Chang before or after you spoke to
 5   Mr. Seligman of Graham-Field?
 6            MR. NEGRON GARCIA: Your Honor, no basis for the
 7   subject.
 8            THE COURT: You mean it's beyond the scope?
 9            MR. NEGRON GARCIA: Yes. Not only that, Your Honor,
10   beyond the scope of the direct but also the fact that he's
11   assuming some facts as to the question.
12            THE COURT: Sustained.
13   By MR. MCCULLOCK:
14   Q    Is Mr. Seligman the chairman of the board of Graham-Field
15   Incorporated?
16   A    Vice president of the board?
17   Q    No, chairman of the board.
18   A    At the moment when I was working for GF, yes.
19   Q    And at some point in time did you have communications with
20   Mr. Seligman about the significance of this termination of the
21   distributorship --
22            MR. NEGRON GARCIA: Objection, Your Honor, leading.
23            THE COURT: Not only leading, but isn't that the object
24   of this case?
25            MR. NEGRON GARCIA: Yes.
```

**20**