38

1  THE COURT: Whether he was terminated or not.

2  MR. NEGRON GARCIA: Yes. Your Honor, as a matter of
3  fact, Your Honor obviously has read the case it doesn't say that
4  we are terminating this contract at all.

5      We are putting different conditions for X reasons.
6  And, obviously, if they are presenting the document they have to
7  accept all the contents of that document.

8  MR. MCCULLOCK: Your Honor, I'm asking him about a
9  document that they admitted to be in evidence. It's in evidence
10 and I'm asking about what happened after the document was
11 received by the witness.

12 THE COURT: But his objection is that the question that
13 you're asking is against the contents of the document.

14 MR. MCCULLOCK: Is against the contents?

15 THE COURT: It's against the contents.

16 MR. MCCULLOCK: The contents speak for itself. I'm
17 asking the witness solely about who he contacted and when,
18 regarding --

19 THE COURT: But that's the problem. You can ask him
20 about who he spoke to, about and when. But the problem is that
21 you're putting an end to that question by stating a premise which
22 is against the letter.

23 MR. MCCULLOCK: Let me go back.

24 THE COURT: All right.

25 By MR. MCCULLOCK:

**21**

39

1  Q    Mr. Guzman, when you received this letter did you understand
2  that Tuffcare was terminating its relationship with --
3          MR. NEGRON GARCIA:  Objection, Your Honor.
4          THE COURT:  He can answer that.
5              Did you understand that to be a termination?
6          THE WITNESS:  No, what I understood was that they were
7  demanding that invoices were paid on time and also payment for
8  pending invoices.
9  By MR. MCCULLOCK:
10 Q    As of this time, isn't it true, there were no invoices
11 pending with Tuffcare?
12 A    I wasn't aware that there were any pending invoices.  But
13 the communications at all time between Tuffcare and myself was
14 for the payment on time because payment was not being made on
15 time.
16 Q    Mr. Guzman, when did you receive this notice?
17 A    I don't remember exactly if it got there on the 30th.  I
18 know I received it, but I don't recall the exact date.
19 Q    Did these come in by fax or by other means?
20 A    I don't remember how it came in.  I just remember that I
21 received it.
22 Q    The day after this was New Years Eve, correct?
23 A    Yes.
24 Q    And your office was closed for a half a day on New Years
25 Eve, correct?

40

```
 1              You people went home early.
 2   A    Yes, we go generally before time.
 3   Q    The next day was a regular holiday New Years Day, correct?
 4   A    Yes.
 5              MR. NEGRON GARCIA:  Objection, Your Honor.  Excuse me,
 6   but I don't see the relevance.
 7              THE COURT:  Well --
 8              MR. NEGRON GARCIA:  Up to now.
 9              THE COURT:  Overruled.
10              MR. MCCULLOCK:  You can answer.
11              THE INTERPRETER:  He did.
12   By MR. MCCULLOCK:
13   Q    Now, at the time you first saw this letter -- withdrawn.  In
14   this letter, there is a demand that something be done by January
15   2nd, isn't there?
16   A    Yes.
17   Q    When you first saw this letter was it before or after
18   January 2nd?
19   A    I don't remember the exact date.
20   Q    Now, subsequent to this letter did you have a discussion
21   with Mr. Seligman of Graham-Field Express?
22              THE COURT:  Did you have a discussion, subsequent to
23   this letter?
24   By MR. MCCULLOCK:
25   Q    Subsequent to receiving this letter did you have a
```

23

41

1   discussion with Mr. Seligman about the fact that Tuffcare had
2   terminated Graham-Field as its distributor?
3   A    I had a discussion with Mr. Seligman, but it was not as to
4   the termination of the agreement. It was about the letter, but
5   it was headed to the terms of payment, payment terms.
6   Q    Did you try to make any orders to Tuffcare after receiving
7   this letter?
8   A    I don't recall.
9   Q    Now, after this letter and your discussions with
10  Mr. Seligman, did Mr. Seligman write a letter to Tuffcare trying
11  to reinstate the relationship with Tuffcare?
12          MR. NEGRON GARCIA: Excuse me, Your Honor, objection.
13  If there is a letter please, I haven't seen it.
14          THE COURT: Well --
15          MR. MCCULLOCK: My question is, did Mr. Seligman write
16  a letter. I'm not presenting him with a letter right now.
17          THE COURT: If you're asking for non contents the
18  question the objection is overruled. If you're asking for the
19  contents --
20          MR. MCCULLOCK: No.
21          THE COURT: -- the objection will be granted.
22          MR. MCCULLOCK: No, I'm not asking for the contents.
23  I'm just asking --
24          THE COURT: Does he know if there was a letter.
25  By MR. MCCULLOCK:

**24**

42

1  Q    Do you know whether Mr. Seligman wrote a letter to Tuffcare
2  about seeking to get reinstated to Tuffcare as a distributor?
3  A    I had no knowledge of that letter.
4  Q    Mr. Guzman, did you attend a trade show in New Orleans in
5  October of 1997, on behalf of Graham-Field Express?
6  A    Yes.
7  Q    And at that time did you speak with Mr. Chang about the
8  future of Tuffcare in Puerto Rico?
9  A    Yes.
10 Q    And at that time did he tell you that he was setting up his
11 own distribution system in Puerto Rico.
12 A    Basically, the conversation that we had in New Orleans was
13 as to how I was going to do the marketing of his products.
14 Q    How V.C. Medical was going to continue to do the marketing
15 of his products?
16 A    GF Express.
17 Q    At that time he didn't tell you that he was prepared to
18 enter into an agreement with Jesus Garcia, Jesus Garcia was going
19 to be his exclusive sales representative in Puerto Rico, did he?
20 A    No.
21 Q    And he didn't tell you that he was going to set up a company
22 called Medex that would lease its own warehouse and warehouse
23 Tuffcare goods for direct sale into Puerto Rico?
24 A    No.
25 Q    And he didn't tell you he was going to start selling

25

43

1  products, Tuffcare products directly in Puerto Rico as early as
2  November and December of 1996?
3          MR. NEGRON GARCIA: I'm sorry, Your Honor, but I'm not
4  able to understand -- to hear clearly his questions from where
5  I'm seated.
6          MR. MCCULLOCK: All of this is --
7          THE COURT: The problem is he can't hear you. He's not
8  objecting. He can't hear you.
9          MR. NEGRON GARCIA: Will you repeat the question?
10         MR. MCCULLOCK: Could you read back the last question.
11         THE COURT: Please do so. Thank you.
12              (QUESTION READ BACK BY THE COURT REPORTER)
13         THE WITNESS: No.
14 By MR. MCCULLOCK:
15 Q   What kind of promotions did he talk to you about, where
16 GF Express would be promoting the Tuffcare products in Puerto
17 Rico at the show in New Orleans?
18 A   I don't understand the question.
19 Q   I believe you said that you discussed with him promotions by
20 GF Express of the Tuffcare products in Puerto Rico correct.
21 A   I don't understand the question.
22 Q   You had discussion with Mr. Chang in New Orleans in October
23 at the show?
24 A   Yes.
25 Q   And those discussions centered on the continuance by

26

```
 1  GF Express as the representative for Tuffcare products in Puerto
 2  Rico, correct?
 3          THE INTERPRETER:  I'm sorry, I didn't understand the
 4  beginning.
 5          THE COURT:  And those discussions --
 6  By MR. MCCULLOCK:
 7  Q    And those discussions centered on the continuance of
 8  GF Express as the representative for Tuffcare sales in Puerto
 9  Rico; is that correct?
10          MR. NEGRON GARCIA:  Your Honor, I have to object to the
11  question.  Because in the way it's phrased there could be an
12  interpretation whether he was going to be one of the
13  representives in Puerto Rico or he was the exclusive
14  representative of Puerto Rico.
15          In other words, if he wants to make the question
16  make it clear because Your Honor should have, you know, the
17  benefit of the question and the answer in its proper perspective
18  because that's what we're dealing here.
19          THE COURT:  Sustained.
20  By MR. MCCULLOCK:
21  Q    Mr. Guzman, as far as you knew as of October of 1997, no
22  body but GF Express was selling Tuffcare products in Puerto Rico,
23  is that correct?
24  A    That is correct.
25  Q    And when you met with Mr. Chang at that time in October, did
```

45

```
1   he do or say anything that led you to believe any differently
2   i.e., that other people were selling products, Tuffcare products
3   in Puerto Rico?
4   A    Basically, what was discussed at that meeting was Tuffcare's
5   situation with Graham-Field.
6   Q    By that you mean continuation of the established
7   relationship that existed?
8              MR. NEGRON GARCIA:  Objection, Your Honor.  This is not
9   what he meant, he's putting words in the witness.
10             THE COURT:  Well, it is technically his witness.  You
11  just brought it up as technically a hostile -- because it's
12  crucial to the Court to determine whose side is he on.  And he
13  has now his hat on as a Graham-Field, Puerto Rico, Inc.,
14  president, so that question is leading.
15             MR. MCCULLOCK:  Your Honor, he's been produced without
16  subpoena by the other side and I didn't call him.
17             THE COURT:  But he's still testifying about facts which
18  occurred under his incumbency as president for plaintiff.
19             MR. NEGRON GARCIA:  Excuse me, Your Honor.
20             MR. MCCULLOCK:  I'm on cross examination, Your Honor.
21  I'm allowed to ask leading questions.
22             THE COURT:  But you're cross-examining your own
23  president, aren't you?
24             MR. MCCULLOCK:  Former president.
25             THE COURT:  But he's your president.
```

46

1  MR. MCCULLOCK: But Your Honor, it's his witness. I'm
2  cross-examining his witness and for that reason I should be
3  allowed to ask leading questions. I don't have to qualify him as
4  a hostile witness, I'm not the one who called him.
5        And this is not direct, this is cross examination.
6  And on cross examination of a witness that they presented I
7  should be allowed to ask.
8        THE COURT: Mr. Garcia.
9        MR. NEGRON GARCIA: Yes, Your Honor, to start with
10  Mr. Guzman was subpoenaed by me. So it's a matter of I
11  subpoenaed him, because we subpoenaed through the rules of the
12  Court the same as he subpoenaed the other witnesses himself.
13        The other thing, Your Honor, is that in this
14  moment Mr. Guzman -- he's asking questions about Mr. Guzman's
15  dealings with, you know, as president.
16        And in that moment he's an adversary or whatever
17  of Mr. Chang because he can't bring up -- I basically feel that
18  he would be used, if necessary we would be using him as rebuttal
19  witness of, you know, of the statements of their witnesses.
20  Because they're the ones who are moving this Court to issue a
21  preliminary injunction, and up to now the only evidence that has
22  been presented has been our evidence whereby we complied with
23  Your Honor's orders that we show why it should not be issued, but
24  they haven't established one single fact.
25        On the contrary, what we're saying is that they

made allegations that they introduce in their claim having sustained at all what we have in evidence that those allegations are not true.

THE COURT: I know, but you're way ahead of me. I have the narrow question of fact. If this, the narrow question before me if I should allow this witness to be cross examined with leading questions, which normally you can do, there is no doubt about it. But the fact is that he's the president of -- he was the president of plaintiff, and in that sense, in that sense if I have to align him, I have to align him on your side and not on their side as to the fact that he was a former president.

MR. MCCULLOCK: But, Your Honor, he's been presented by them as a witness. Not by me. And it's a former president and he's no longer involved with the company.

And I'm asking him about past events. I just -- I don't see that -- I don't think that the status of where a person was, whose side he was on before or after because sometimes you don't know where a person was at the time, who he was negotiating for. I don't think --

THE COURT: But in this case I do. He was the president. And you're asking him of facts during his incumbency as president, am I correct in that?

MR. MCCULLOCK: Yes. But I'm asking about evidence -- testimony that was adduced in his direct. When he gave in response to their questions they didn't have to -- they asked

1  By MR. MCCULLOCK:

2  Q    Excuse me?

3          THE COURT:  There was a "mal estar".

4          THE INTERPRETER:  Upsetting.

5          MR. NEGRON GARCIA:  Bad feelings.

6          THE COURT:  Bad feelings.

7          THE WITNESS:  From Tuffcare to Graham-Field.  Because
8  Graham-Field was not paying Tuffcare on time.  And on several
9  occasions I had discussions with Mr. Chang where I personally had
10 to call the collections department.  And he also mentioned that
11 his business was being affected, that he didn't have the same
12 volume of business.

13         MR. MCCULLOCK:  Your Honor --

14         THE WITNESS:  And that he no longer felt --

15         MR. MCCULLOCK:  This demonstrates -- I asked the
16 question --

17         THE WITNESS:  And that he no longer felt the same with
18 that I presume, that they were thinking about opening operations
19 in Puerto Rico.

20 By MR. MCCULLOCK:

21 Q    When did he first tell you they were thinking about opening
22 up operations in Puerto Rico?

23 A    I suspected or foresaw that they had that intention.

24 Q    Specifically, Mr. Guzman, would you answer the question:

25         When did Mr. Chang tell you that they were thinking,

51

1  Tuffcare was thinking about opening operations in Puerto Rico?
2      MR. NEGRON GARCIA: Objection, Your Honor. He's
3  assuming that Mr. Chang said to him and he has testified that he
4  hasn't presented, but there is nothing in the record to show that
5  Mr. Chang told him.
6      THE COURT: Overruled.
7      THE WITNESS: In January of this year Mr. Chang came to
8  the island and he told me directly that he was thinking about
9  opening operations in Puerto Rico.
10 By MR. MCCULLOCK:
11 Q    That was in January of 1998?
12 A    Yes.
13 Q    Did he tell you that at that time they already rented a
14 warehouse and had operations going?
15 A    Yes.
16 Q    That's the first you knew about Tuffcare having operations
17 itself in Puerto Rico, correct?
18 A    I was able to confirm it then.
19 Q    Did you ever, with a group of other people, make a
20 proposition to Mr. Chang that you and the other group, and the
21 group which you were a part, should go back to repping or being
22 the distributor for Tuffcare?
23 A    No.
24 Q    One minute.
25     MR. MCCULLOCK: I have no more questions.

1    Q    Okay.
2    A    Make the same efforts.
3    Q    But you were selling other products besides Tuffcare
4    products when you became president of the corporation?
5    A    That is correct.
6    Q    And you devoted time to sell wheelchairs that competed with
7    Tuffcare; am I correct?
8    A    That is correct.
9    Q    Did you receive any instructions from your superiors while
10   you were -- superiors from Graham-Field as to the efforts you
11   should devote to sell Tuffcare products, particularly the
12   wheelchairs?
13         MR. MCCULLOCK:  Objection, Your Honor.  I didn't cover
14   any of this on cross.  This is not redirect.  It's all new
15   material.
16         MR. NEGRON GARCIA:  May I, Your Honor.  No, it's
17   basically taken -- he started asking questions about the
18   relationship with Mr. Chang and the reasons Mr. Chang may have
19   had to terminate, in his words, he's using that objective, we
20   don't accept it, the relationship.
21              So, I want to establish from the same that he
22   opened the door to establish the other reasons that may have
23   happened, the things that happened between him and his superior.
24   And he basically answering the basic question, of his
25   conversations with his superiors I'm just going broader.

33

56

1  stipulation was September 4th, 1990, until December 31st, 1990,
2  was two hundred thousand.
3          MR. NEGRON GARCIA: 1996, Your Honor.
4          THE COURT: 1996.
5          MR. NEGRON GARCIA: That was the stipulation. That's
6  what I'm asking.
7          THE COURT: And then 1997 four hundred and twenty-five
8  thousand, around.
9          MR. MCCULLOCK: Yes.
10 By MR. NEGRON GARCIA:
11 Q   I'm asking: Can you state the reason why, instead of
12 selling around eight hundred thousand dollars or six hundred
13 thousand dollars, whatever, you sold only four hundred fifty
14 thousand?
15         THE COURT: I think I have the answer to that. He's
16 already provided the answer to that. I think the record is
17 clear. He testified that they were selling competing products.
18 That's what he testified.
19         MR. NEGRON GARCIA: Yes, Your Honor. Thank you, Your
20 Honor. I'm sorry, but it's late in the afternoon.
21         THE COURT: No, it's not that late.
22         MR. NEGRON GARCIA: But Your Honor, you have more
23 stamina than I do.
24         We would have no more questions.
25         THE COURT: Good, sir, you're excused.

34

93

1  and fifty-five cents, correct?
2  A    Yes.
3  Q    And there was a dispute about that thirty-five hundred and
4  fifty-seven dollars and eighty cents on the invoice, wasn't
5  there?
6  A    There shouldn't be any dispute.
7  Q    Exactly. People should do exactly what you say, shouldn't
8  they?
9  A    Of course.
10 Q    Okay. But sometimes people disagree with you, don't they?
11 A    In what sense?
12 Q    Okay. Now, Mr. Chang, I'd like to refer back to Exhibit E,
13 which is the August 27, 1996 letter, that you wrote to
14 Mr. Guzman.
15         Now, what exactly were you consenting to when you said
16 that you consented to the assignments of the distribution
17 agreement by and between V.C. Medical and Tuffcare to
18 Graham-Field Express?
19 A    Arrangement. It didn't say agreement. It says arrangement.
20 Because at that time I consider there is no agreement. There is
21 only arrangement, distribution arrangement that we want to sell
22 to them; if they only pay on time we continue to sell to them.
23 Q    So, the distribution arrangement that you had, according to
24 this letter you were willing to continue and were continuing the
25 distribution arrangement with Graham-Field, that you had

35