```
 1  INTERPRETER:
 2       There was a competitor...
 3  MRS. LOURDES PAGAN GONZALEZ:
 4       It's alright.
 5  INTERPRETER:
 6       ...of Graham Field.
 7  DEPONENT:
 8       "...y donde pidió que, ellos enviaron una carta diciendo
 9  que no, que no, que se, que no había ninguna relación
10  exclusiva."
11  INTERPRETER:
12       And, uh, a letter was sent where it stated that there was
13  not, no exclusive relationship.
14  MR. KENNETH McCULLOCH, ESQ:
15       Q    Now, at this time, uh, when you were operating V.C.
16  Medical, were you selling, reselling, uh, Tuffcare products to
17  your father's or, or mother's company?
18       I    "Ahora, en este momento cuando usted tenía V.C.
19  Medical, ¿usted estaba vendiendo, revendiendo productos al
20  negocio de sus padres, de su papá o su mamá?"
21       A    "Sí."
22       I    Yes.
23       Q    Okay. And, um, did your father and mother continue
24  in the same company or did your mother, at some point, set up
25  her own company?
```

1  once he mentioned that, uh, he was worried about the prices
2  that he was giving us...
3      A    "...porque normalmente esos precios era para precios
4  a, para pagarse a treinta (30) días..."
5      I    ...because normally those were prices given to be
6  paid within thirty (30) days...
7      A    "...y ahora estando en Graham Field se estaba yendo
8  más del tiempo estimado."
9      I    ...and now at Graham Field the time, uh, was longer
10 than the estimated length of time they expected to be paid.
11     Q    So the regular time for payment when you were with
12 V.C. Medical and Graham Field was thirty (30) days for, for
13 Tuffcare invoices?
14     I    "Ahora, ¿el tiempo regular para las, eh, para pagarle
15 a Tuffcare, eh, usted en V.C. Medical y en Graham Field, eran
16 treinta (30) días?"
17     A    "No, normalmente, eh, la mercancía se embarcaba y
18 nosotros mandábamos el cheque."
19     I    No, normally, as the merchandise was shipped we would
20 send a check.
21     A    "En los peores escenarios para mí era treinta (30)
22 días."
23     I    The worst scenario for me was thirty (30) days.
24     Q    When you say "for me", you mean "me" as V.C. Medical
25 or me as Graham Field Express?

1   I   "Cuando usted dice "para mí", ¿se refiere usted V.C.
2  Medical o usted Graham Field?"
3   A   "Bueno, en V.C. Medical el peor escenario era treinta
4  (30) días, pero en Graham Field el peor escenario podía ser
5  noventa (90) días."
6   I   Well, at V.C. Medical the worst scenario would be
7  thirty (30) days, but with Graham Field it could be up to
8  ninety (90) days.
9   Q   Did, uh, did V.C. Medical ever make blanket orders to
10 Tuffcare?
11  I   "¿Y V.C. Medical alguna vez le, le hacía "blanket
12 orders", uh...?"  I, I do not know the...
13  A   "No sé lo que es "blanket order"."
14  I   I do not know the translation of blanket orders,
15 Counsel.
16  Q   Have you ever, uh...? What...?
17  I   And, and the witness said: "I do not know what
18 blanket orders are."
19  Q   Okay. Now... In describing the ordering procedures,
20 um... and, and when the payment would go...
21  I   "Ahora, al hablar de las órdenes y el procedimiento
22 y a dónde iba el pago..."
23  Q   ...uh, I'm trying to establish the sequence. First,
24 the... Lets take the time when you were with V.C. Medical.
25

```
 1    I    Well, the, the way it, it was done with Graham Field,
 2  it changed a bit from the way it was done with V.C. Medical.
 3    A    "Pues porque V.C. Medical yo era mi propio jefe y en
 4  Graham Field tenía un superior a quien reportar y..."
 5    I    You see, because when I was with V.C. Medical I was
 6  my own boss and with Graham Field I had a, a superior to whom
 7  I had to report...
 8    A    "...y en muchas ocasiones, pues, eh, pues tenía que
 9  escribirlo todo para tener la constancia de lo que estaba
10  pasando."
11    I    ...and...
12    A    "No recuerdo específicamente qué, pero muchas, en
13  muchas ocasiones escribía casi todo."
14    I    ...and on most occasions I had to, uh, write things
15  down to have verification of what was happening.  Not on all
16  occasions, but on most of the occasions everything had to be
17  written down.
18    Q    Well, with respect to the price at which were
19  ordering, what would you write and...?  What would the
20  procedure be when you were with Graham Field Express?
21    I    "Con relación a, a las compras, al precio que le
22  daban, ¿qué era lo que tenía que escribir? ¿Cuál era el
23  procedimiento que seguían cuando estaban con Graham Field
24  Express?"
25
```

1  A    "Bueno, en Graham Field yo tenía una preocupación y,
2  y escribía casi todo lo relacionado a Tuffcare..."
3  I    Well, at Graham Field I had a concern, so I would
4  write down almost everything related to Tuffcare...
5  A    "...ya que Irwin Selinger, eh, me había notificado en
6  varias ocasiones, eh, pues, que no se sentía cómodo de que yo
7  estuviera comprando 'competitive products' con...
8  I    ...because on several...
9  A    "...de Tuffcare."
10 I    ...occasions Irvin Selinger told me that he had a
11 concern that I was buying competitive products from Tuffcare.
12 A    "Y casi siempre escribía y le enviaba notificación a
13 él de las cosas que estaban pasando relacionadas a Tuffcare..."
14 I    And most of the time I would write down and send
15 information to him about what was happening with Tuffcare...
16 A    "...para comprobarle que en muchas ocasiones, pues,
17 tenía que hacer alguna orden específica y él me autorizara."
18 I    ...to prove to him that on some occasions I would
19 have to place a specific order and I would have his
20 authorization.
21 Q    Vis a vis you and Hilda, so that Hilda would be able
22 to tell that the price that Tuffcare was charging on an invoice
23 was the price that you agreed to, when you were with Graham
24 Field Express, what was the procedure you followed vis a vis
25 Hilda?  What did you give to her or what did you tell her in

```
 1  INTERPRETER:
 2       "...y Tuffcare asignándole, designando a Graham Field
 3  Express?"
 4  DEPONENT:
 5       "Eso es al de, al acuerdo que teníamos..."
 6  INTERPRETER:
 7       The agreement we had...
 8  DEPONENT:
 9       "...de 1990..."
10  MRS. LOURDES PAGAN GONZALEZ:
11       Uh, Exhibit one (1).
12  INTERPRETER:
13       ...of 1990.
14  DEPONENT:
15       Exhibit "uno (1)".
16  INTERPRETER:
17       Exhibit one (1).
18  MR. KENNETH McCULLOCH, ESQ:
19       Q    Now, in Exhibit three (3)...
20       I    "Ahora, en el número tres (3)..."
21       Q    ...that, that letter says: "This letter is to
22  terminate the Exclusive Sales Agreement between V.C. Medical
23  and Tuffcare signed on October 1990", correct?
24       I    "Ahora, el número tres (3) dice que la carta es para
25  terminar el Acuerdo de Ventas Exclusivas entre V.C. Medical y
```

```
 1  Tuffcare y se firmó en octubre del '90, ¿no?"
 2       A    "Sí."
 3       I    Yes.
 4       Q    Okay.  Now did Exhibit three (3)...?  Here's my
 5  question.  If, if Exhibit three (3) terminated Exhibit one (1),
 6  then how could Exhibit four (4) notify him of the proposed
 7  assignment of Exhibit one (1) if it had been terminated?
 8       I    "Ahora, si el Exhibit número tres (3) ponía un fin al
 9  Exhibit número uno (1), que es el acuerdo, ¿cómo podía entonces
10  el Exhibit cuatro (4) hacer, eh, estar asignando, designando el
11  Exhibit uno (1) que ya había sido terminado?"
12       A    "Yo lo que le quise decir fue a ver si era posible
13  mantener la relación que teníamos antes con V.C. Medical..."
14       I    What I meant to say was if it was possible to keep
15  the relationship that we had before with V.C. Medical...
16       A    "...y..."
17       Q    By, by...  Go ahead.
18       A    "...eh, cuando esté con Graham Field."
19       I    ...when I, I was to be with Graham Field.
20       Q    So the intent of Exhibit four (4) was to try to
21  retain the same relationship with, with Tuffcare for Graham
22  Field Express as you had in number one (1)?
23       A    "Sí."
24       I    Yes.
25
```



*[handwritten: Dr. Kenneth McCulloch 12/29/0]*   20

## EXCLUSIVE SALES AGREEMENT

This agreement between Tuffcare located at 1171 North Armando Street, Anaheim, California 92806(refer herein as the Manufacturer) and VC Medical Distributor located at San Patricio Avenue #792, Las Lomas PtoNuevo, PR 00921(refer herein as the Distributor) is subject to the following terms and conditions:

1) The Distributor is the exclusive distributor in Puerto Rico.

2) All sales leads from Puerto Rico will be refer to the Distributor.

3) The Distributor agreed to promote and sell wheelchairs and related products only for the Manufacturer.

4) The Distributor must purchase average of $10,000 per month in order to maintain the exclusive status. Performance will be reviewed every 3 months.

5) This contract is valid until September 30, 1991. The contract can be renew by increasing sales performance to $15,000 per month.

Tuffcare

_Calvin Chang_  10/3/90
Calvin Chang         Date
Vice President

VC Medical Distributor

_Vicente Guzman Jr._  10/15/9
Vicente Guzman         Date
Owner

_Hilda Salgado_  10/15/90
Hilda Salgado         Date
Owner

63

② Kenneth McCulloch - Vicente Guzman

## SCHEDULE 1.01(a)(vii)

### BUSINESS CONTRACTS

See attached.

1. Agreement of exclusive distributorship between V C Medical Distributors, Inc. and Contemporary Products, Inc. as of September 1, 1995.

2. Agreement of exclusive distributorship between V C Medical Distributor, Inc. and Klams International and/or Industrias Klusman Ltd. as of July 21, 1995.

3. Agreement of exclusive distributorship between V C Medical Distributor, Inc. And Encore, Inc. as of September 26, 1995.

4. Agreement of exclusive distributorship between V C Medical Distributor, Inc. And Tuffcare Incorporation dated October 8, 1990.

5. Trial Distributor Agreement between V C Medical Distributor, Inc. And Thomas Industries Holding Inc. (Power Air Division) dated October 13, 1995.

64

07 98 02:18p        Calvin                          714-666-3199              p.3

                         V C MEDICAL DISTRIBUTORS  8897933677         P.01



3999 E. LA PALMA AVE., ANAHEIM, CA 92807
TEL: (714) 632-3999 • FAX: (714) 632-3798

③ Kenneth McCullough - Vicente Guzman    12/00/01  ☐YES ☐NO

Aug. 13, 1996

This letter is to terminate the Exclusive Sales Agreement between VC Medical Distributor and Tuffcare Signed in Oct. 1990. Both company will continue to do business at good will.

Tuffcare                                VC Medical Distributor

_____ 8/13/96                 _____ 8-14-96
Calvin Chang      Date                  Vicente Guzman    Date
Vice President                          Owner

                                        _____ 8/14/96
                                        Hilda Salgado     Date



# VC MEDICAL DISTRIBUTORS, INC
## HOSPITAL & HOME CARE EQUIPMENT

Calle Ganges # 1536 - Urb. Industrial El Paraiso, Río Piedras, Puerto Rico 00926
Tels. 281-0744 / 281-0745 • Fax. 281-8139

*(4) Kenneth McCullouch - Vicente Guzman* 12/30/97

August 17, 1996

Calvin Chang
Tuffcare, Inc.
P.O. Box 1489
Pompano Beach, FL 33061

Re:   Assignment of Distribution Agreement

Dear Mr. Chang:

We hereby notify you of the proposed assignment of the Distribution Agreement by and between VC Medical Distributors, Inc. ("VC") and you (the "Distribution Agreement") to Graham Field Express (Puerto Rico), Inc. ("GFE") upon the closing of the sale of the business and assets of VC to GFE.

We hereby respectfully request your consent to the assignment of the Distribution Agreement to GFE; provided that GFE will use its best efforts to continue the distribution of your products, being expressly understood that GFE will be able to distribute competing products as well. All other terms and conditions of the Distribution Agreement shall remain in full force and effect after such assignment.

Cordially,

VC MEDICAL DISTRIBUTORS, INC.

By: _____
    Vicente Guzmán Jr.

cc: Richard S. Kolodny, Esq.

#51467.02

66