IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| GRAHAM-FIELD, INC. *et al.* | * |
| | * |
| | * CIVIL NO. 98-1306 (DRD) |
| Plaintiffs | * |
| | * |
| vs. | * |
| | * |
| TUFFCARE, INC. | * |
| Defendant | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CALVIN CHANG'S DECLARATION UNDER PENALTY OF PERJURY

TO THIS HONORABLE COURT:

I, Calvin Chang, pursuant to 28 U.S.C. §1746, provide the following declaration of facts based on my personal knowledge, under penalty of perjury:

1. I am Calvin Chang, of legal age, married and resident of Pompano Beach, Florida, U.S. The facts set forth below are based on my personal knowledge. I have made this Declaration voluntarily for the use in the above captioned case.

2. I am the Vice President of Tuffcare, Inc. and have worked in Tuffcare since the early 1990's. In the capacity, I appeared on behalf of Tuffcare and entered into an exclusive distribution contract with VC Medical Distributors. The exclusivity was **only** for the distribution of **wheelchairs**. The dual exclusivity agreement was that Tuffcare would only sell to VC Medical the product line of wheelchairs and VC Medical would not buy wheelchairs from any other manufacturer. VC Medical also purchased from Tuffcare canes and walkers, and related products on a non-exclusive basis.

3. While the distribution agreement was in effect, VC Medical purchased and promoted beds from other manufacturers and never bought beds from Tuffcare.

4. On or about September 1996, Vicente Guzmán, Jr. to purchase VC, called me to inform me that in order for the sale of VC Medical to Graham-Field, Inc. take place, the latter, Graham Field, Inc. demanded that Vicente Guzmán, Jr. renegotiate VC Medical's dual exclusive distributor contract with Tuffcare, since Graham-Field, Inc. manufactures and sells competing products.

195

Calvin Chang's Declaration Under Penalty of Perjury.
Civil No. 98-1306 (DRD)
Page no. 2

5. As such, the Exclusive Sales Agreement between VC Medical and Tuffcare was terminated by letter signed by both interested parties.

6. After the Exclusive Sales Agreement between VC Medical and Tuffcare was terminated, that had been exclusive for the sale of **wheelchairs,** it changed on August 27, 1996 wherein I, in representation of Tuffcare, accepted the assignment of contract pursuant to all the terms and conditions of the original contract (net 10 days, minimum purchases of **wheelchairs**), except that the companies will continue to do business at **good will.**

7. When Vicente Guzmán was President of GFE, he would call me all the time to negotiate better prices for GFE, depending on the quantity to be purchased. To the best of my knowledge, after Vicente left GFE, no one from GFE has placed a similar calls to Tuffcare.

8. When Tuffcare purchases abruptly decreased, I spoke to Vicente Guzmán, Jr., as President of GFE, as to why this was happening and he acknowledged that although he tried to continue ordering the same line of products from Tuffcare on a non-exclusive basis that he had purchased when he was the owner of VC Medical, he was expressly told not to do so by GF's CEO, Irwin Selinger and by GF's General Counsel, Richard Kolodny.

9. With the exception of GFE (Puerto Rico), no other GF subsidiary in the world has bought or buys products from Tuffcare. All of Tuffcare products compete directly with GF's own product lines.

10. Shortly after GFE opened its doors in Puerto Rico, GF's CEO, Irwin Selinger contacted me and explained that GF was having quality control problems with its Everest and Jennings wheelchairs manufactured in Indonesia. Selinger proposed that Tuffcare assemble the Everest and Jennings wheelchairs with E & J tooling, to be sold under the E & J label, as Tuffcare and E & J parts are 100% compatible. I was very interested in this venture, but notwithstanding various calls to Selinger, he never responded and the matter was dropped.

11. GFE purchases of Tuffcare products by GFE declined over forty percent 40% on the first year, and over 70% the second year. This brought the sales below the contractual minimum in the assigned distribution agreement. Furthermore, GFE was paying invoices very late, some times 60 up to 120 days late, violating the net 10 day payment agreement set forth by the parties.

Calvin Chang's Declaration Under Penalty of Perjury.
Civil No. 98-1306 (DRD)
Page no. 3

12. For this reason, on December 30, 1997, Tuffcare gave GFE a short term to pay all pending invoices or it will consider that GFE was not interested in purchasing Tuffcare products anymore. When the company did not receive the expected response to said letter, as stated, Tuffcare canceled all pending orders.

13. As of February 6, 1998, GFE owed a total of $13,855.04 in unpaid balance and interest accrued. As such, they were put on credit hold, which meant that all previous balance must be paid before the new order could be shipped.

14. On May 11, 1998 Sara Figueroa prepared Purchase Order Number 668999, to Tuffcare for numerous wheelchairs and beds. The P.O. did not specifiy a unit price and stated as terms of payment, net thirty (30) days after receipt of merchandise. It contained a typewritten note "Pricing must be confirmed prior to shipping" as well as a handwritten note that stated "Confirm pricing via fax 787-286-0855, Sara". The next day, on May 12, 1998 Sara Figueroa prepared Purchase Order Number 660137, to Tuffcare for numerous beds. This P.O. also did not specifiy a unit price and stated as terms of payment, net thirty (30) days after receipt of merchandise. It also contained a typewritten note "Prices must be confirmed prior to shipping." Due to the remaining "credit hold', these orders were not shipped.

15. Tuffcare officials have made numerous unsuccessful attempts to sell its products to Plaintiffs. Tuffcare's Regional Sales Manager Barry Cleveland, faxed to GFE's Sara Figueroa on October 8, 1998, the Special Distributor Prices for the T2000 bed. Furthermore, Tuffcare has made it very clear at all times that GFE purchases of Tuffcare's products would be **at the same price and terms quoted to Medex.** Barry Cleveland sent Sara Figueroa letters on June 4, 1999, June 18, 1999 and June 21, 1999, June 24, 1999, July 22, 1999, September 20, 1999, April 11, 2000.

16. Medex does purchase enough Tuffcare units of a product in one year to qualify for the lowest price available, ($329 now, $347 before for the T2000 bed). In the year 2000 alone, Medex had a "blanket" or "standing" order for 3,000 units of the T2000 beds. Then she would just only control the timing of delivery to make sure there is enough space in the warehouse to receive the beds. Any distributor can take advantage from a better price in the middle of the year. Medex benefitted from a reduction in price given to any distributor that placed an order of 500+ of T2000 beds. The price was lowered from $347 because of a decrease in sales. It turned out to be too high, (not competitive in the market) ever since the price had been raised from $229 until mid 1998.

**197**

Calvin Chang's Declaration Under Penalty of Perjury.
Civil No. 98-1306 (DRD)
Page no. 4

17. I have never told anyone working for me to "beat" a price or "camouflage" a price in a promotion. At times, I have advised to **match** the competition's prices. All companies, including Tuffcare and Graham-Field, Medex and GFE, from time to time have special promotions. Sometimes the promotion is used to introduce a new product in the market and sometimes it is to the contrary: to sell old inventory.

18. When I learned that Hilda Salgado had left GFE, I called her at home and offered her a job at Medex. Not having any impediment to do so, such as a non-competition contract with GFE, she became Medex' new General Manager on February 2, 1998. I gave her free hand in recruiting and she brought Edwin Morales, José Santos and Juan Gómez on board to Medex.

I have read the foregoing, and I declare under penalty of perjury that the foregoing is correct.

In Atlanta, Georgia, this 20th day of March, 2001.

CALVIN CHANG