

# TAKE OF DEPOSITION OF SARA FIGUEROA

**Graham-Field, Inc., et al, V. Tuffcare, Incorporated**

May 5, 2000

2125



ACCURACY of Puerto Rico



United States District of Court
for the District of Puerto Rico

```
Graham-Field, Inc., and Graham-Field
Express(Puerto Rico), Inc.
Plaintiffs

V.

Tuffcare, Incorporated
Defendant
```

Case No. 98-1306 (DRD)

**ARTURO NEGRON GARCIA LAW OFFICE**
Urb. El Vedado,
123 Rodrigo de Triana St.,
Hato Rey, Puerto Rico

Held at
**ARTURO NEGRON GARCIA LAW OFFICE**
Conference Room
Urb. El Vedado,
123 Rodrigo de Triana St.,
Hato Rey, Puerto Rico

Date
May 5, 2000

Hour
09:30 AM



200

# PRESENT WERE

| | |
|---|---|
| Kenneth McCullock, Esq. | For The Plaintiff |
| Arturo Negron Garcia, Esq. | For The Defendant |
| Lisabel Negron Vargas, Esq. | For The Defendant |
| Lisabel Negrón Vargas, Esq. | Notary Public |
| Ms. Sara Figueroa | Deponent |
| Ms. Siria González | Court Reporter |

\* \* \*

MR. NEGRON

Here we are now in the deposition of Sara Figueroa in the Graham Field Inc. and Graham-Field Express (Puerto Rico), Inc. case, Plaintiff has versus Tuffcare Incorporated. This is Civil Case Number 98-1306 (PR) at the US District Court of Puerto Rico. Before we go on, Counsel, we go with the usual stipulations as to any objections are not waived, they are reserved to be raised in Trial and when the depositions are used...

MR. McCULLOCH

Except as to form.

MR. NEGRON

Yes, except as to form, and also as to any privileges obviously, can be raised at any moment. And also, that as soon, when the deposition is finished, as

1  soon as we receive the deposition, you will have thirty
2  days in order to go through it and revise it and to make
3  any amendments, that you feel that are needed to be
4  amended, the corrections, and if they are not, within
5  thirty days, it is stipulated that you accept the
6  deposition as a true one. Okay. The same as we did in
7  the last deposition, I will have to...are you a Notary,
8  Lisabel?
9  MS. NEGRON
10     Yes.
11 MR. NEGRON
12     Okay. Will you be so kind and you take the oath of
13 the Stenographer and for the Witness. Please raise your
14 hand...
15 MS. NEGRON
16     Do you swear to transcribe all the proceedings as
17 stated, as you get them in your recording?
18 STENOGRAPHER
19     Yes, I do.
20 MS. NEGRON
21     Do you swear to state the truth as to the best of
22 your knowledge as to the questions that Mr. Negrón García
23 will ask you pertaining to this case?
24 DEPONENT
25     Yes, I do.

1   MS. NEGRON

2       The record should show that present are Ms. Sara

3   Figueroa, she is the person to be deposed in this

4   morning, the Attorney for Graham-Field, Mr. Kenneth

5   McCulloch and Mrs. Lisabel Negrón who is assisting

6   attorney Negrón Garcia, attorney for the Defendant, who

7   will be in charge of the deposition.  Regarding the

8   witness...we now can start the deposition.

9                    **MS. SARA FIGUEROA,**

10                   having been duly sworn,

11                   testifies as follow:

12                   **DIRECT EXAMINATION**

13  **BY ATTORNEY NEGRON:**

14      Q    Please for the record state your name.

15      A    Sara Figueroa.

16      Q    Ms. Figueroa, where do you reside?

17      A    In Guaynabo, Puerto Rico.

18      Q    Guaynabo. Can you tell us the exact address, if

19  you can.

20      A    Yes, Argentina Street E-15, Oasis Gardens, in

21  Guaynabo 00969.

22      Q    Is that right besides, and you correct me, near

23  Villa Lizzette?

24      A    Yes, yes.  Granada Park.

25      Q    Right besides Granada Park, those houses that

6

1  are behind?
2  A   Just after the new development...
3  Q   What's your employment at this point, at this
4  pointing time?
5  A   I'm the Director of Graham-Field Express in
6  Puerto Rico.
7  Q   Since when you have been the Director of
8  Graham-Field in Puerto Rico?
9  A   Since January of 1998 I am there.
10 Q   How long have you worked with Graham-Field?
11 A   Ten years.
12 Q   In Graham-Field or with the...Graham-Field of
13 Puerto Rico or...
14 A   No, with Graham-Filed as a whole.
15 Q   As a whole.  When did you started working in
16 Graham-Field?
17 A   In '98 ?
18 Q   Where?
19 A   In New York, for the industry.
20 Q   Okay.  And what was the name of the particular
21 company you were working with at that time?
22 A   Graham-Field.
23 Q   Graham-Field International or Graham-Field...
24 A   Graham-Field, Inc.
25 Q   What was your employment position at that

**204**

1   Q   Were there any special clients that you
2   thought, you were selling more, you have...
3   A   Sure.
4   Q   Can you recall their names?
5   A   VC Medical.
6   Q   VC Medical, who else?
7   A   Medex, Medcorp, Borschow Hospital...
8   Q   Borschow, Borschow is a big business in Puerto
9   Rico?
10  A   Yes.
11  Q   Then, you started selling to, you arrived here
12  in Puerto Rico when?
13  A   September of '96.
14  Q   September of '96. And did you opened the
15  offices in Puerto Rico, or there were, they already had
16  offices in Puerto Rico?
17  A   No, we bought out VC Medical.
18  Q   In September '96?
19  A   Right around that time we did the closing.
20  Q   Okay. In September '96 you bought VC and you
21  started working with VC. Do you remember selling, before
22  September '96, did you remember selling beds to VC
23  Medical?
24  A   Sure.
25  Q   Yes? And wheelchairs?

11

1   A   Yes. No, not wheelchairs, I'm sorry.

2   Q   Why did you sell any wheelchairs if you produce
3   them?

4   A   To VC Medical?

5   Q   Yes.

6   A   Because they had that distribution of Tuffcare.

7   Q   For the wheelchairs?

8   A   Yes.

9   Q   But they had an exclusivity commitment to sell
10  wheelchairs only from Tuffcare, am I correct?

11  A   At that point I didn't know.

12  Q   You learned that afterwards.

13  A   Right.

14  Q   But that was the reason?

15  A   Correct.

16  Q   Okay. What other sort of products or what
17  other sort no, what other products did you sell to VC,
18  before, obviously, you take over VC?

19  A   Other than the beds?

20  Q   Yes, please.

21  A   Bed rails, patient aids and walkers, commodes,
22  grab aids for the bathrooms, diagnostic products...

23  Q   Walkers you said?

24  A   Walkers.

25  Q   Are you sure of the walkers?

**206**

34

1   A   Yes.

2   Q   And also, do you have to ask a permission from
3   Graham-Field in the States in order to promote, to make
4   a promotion of any product?

5   A   Yes.

6   Q   Okay.  Do you use your blanket orders, the
7   concept of blanket orders?  Blanket orders.

8   MR. McCULLOCH

9   What do you mean with blanket orders?

10  MR. NEGRON: (Cont.)

11  Q   Do you know what a blanket order is?

12  A   Yes.

13  Q   Yes.  Please, explain to us what a blanket
14  order is.

15  A   Is when a purchase during the course of a year
16  a thousand of a particular product, then it should be a
17  hundred each month for, or a hundred and twenty five.

18  Q   Does the posting of a blanket order affect the
19  prices of the product?

20  A   It could.

21  Q   Do any other people that you sell in Puerto
22  Rico to, I'm not talking now of you...back from you in
23  Puerto Rico, do they place blanket orders with you?

24  A   At this time no.

25  Q   Before this time?

1    A    Yes.

2    Q    They have done it?

3    A    They have done, yes.

4    Q    What sort of products, what products
particularly have you sold on the blanket orders?

6    A    Diapers, beds, under pads, wheelchairs
sometimes.

8    Q    And that goes, are the kind of blanket order
in some season...

10   A    No, no.

11   Q    At the time the blanket orders were filed will
you, do that could or would affect prices?

13   A    Sure.

14   Q    Do you sell retailers?

15   A    No.

16   Q    No. You sell to dealers.

17   A    To dealers.

18   Q    How many dealers you have now in your list?

19   A    About three hundred.

20   Q    Going back to the exclusivity contract that we
mentioned originally that VC had or has with Tuffcare,
what did you understand what's the nature of that, if you
can tell us the nature of that exclusivity contract.

24   A    That only we could sell the products.

25   Q    All the products?

36

1   A   At that time it was wheelchairs.

2   Q   But the fact is that once you came to Puerto

3   Rico you started selling, in VC, you started selling

4   wheelchairs, Graham-Field wheelchairs, is that correct?

5   A   Yes.

6   Q   What is your sales under the, the percentage of

7   sales of the wheelchairs in Puerto Rico?

8   MR. McCULLOCH

9       Objections as to the form of the question.

10  MR. NEGRON: (Cont.)

11  Q   In terms of a year.  This last...in 1999, the

12  sales of the wheelchairs and related products to

13  wheelchairs, how much was it of your total sales?

14  A   I don't have that now.

15  Q   You can find out?

16  A   I can find out, yes.

17  Q   Would you have it in percent...I would hold you

18  to...

19  A   I would say 25%.

20  Q   Of your sales.

21  A   Yes.

22  Q   Could be more, less, but...

23  A   Yes.

24  Q   ...basically that.  Ms. Figueroa, in your

25  affidavit, we have marked it as Exhibit 1 of your

49

moment that Graham-Field took over VC in Puerto Rico, does Everest & Jennings belong to Graham-Field?

A   No, no, no yet.

Q   Okay. Well, that was my question, and that it the answer. Do you know when did they acquire it?

A   No, I don't know the exact date.

Q   But...

A   Sometime afterwards.

Q   Sometime afterwards, okay. There's nothing wrong with the answer. Okay. Ms. Figueroa, in your affidavit in support of Plaintiffs' motion, which is for a temporary restraining order, which is Exhibit number 1, in page 2, paragraph 7, you mention that Tuffcare refused to sell, in the last sentence of that paragraph, you mention that Tuffcare refused to sell GFE anything, eventhough I told Tuffcare that GFE would pay COD. Graham-Field Express had to obtain spare parts by cannibalizing new Tuffcare products that GFE still has in stock. Do you remember which parts were cannibalized for which products?

A   Parts of the power wheelchairs. Those are the electric motorized wheelchairs.

Q   How many of them?

A   Two.

Q   Okay. Do you remember, you say, even I told

1  Q    Okay. While you were working there, let's say
2  besides you were heading or not the office, the fact is
3  that these three people worked with you, and then, at any
4  point in time were you boss of any of these people?
5  A    No.
6  Q    No. Okay. Do you know from the records or
7  from any information you might have from your position,
8  your actual position or your former position at Graham-
9  Field that these people had exclusive employment
10 contracts with Graham-Field?
11 A    No, they did not.
12 Q    They did not have. Ms. Figueroa, you mentioned
13 at the beginning of the deposition, and I'm trying to
14 recall it, you mentioned some of the distributors in
15 Puerto Rico, you mentioned Borschow...
16 A    I mentioned to you some of our customers.
17 Q    Okay.  No, no, yes, but I remember you
18 mentioned the word Borschow because I asked you...what
19 are the main distributors in Puerto Rico, in the same
20 level as Graham-Field, for example? Medex, Graham-Field,
21 who else? Your competitors.
22 A    Umeco, and Borschow is a smaller distributor
23 but...
24 Q    Is smaller? Okay. Those are the four
25 distributors in Puerto Rico basically that you say?

**211**

1    you refer here, which products were those?

2    MR. McCULLOCH

3         Counsel, are you...

4    MR. NEGRON:

5         I'm talking about..this is our statement, Defendant

6    has sold its products in Puerto Rico.

7    MR. McCULLOCH

8         Okay, but if you want to take the whole affidavit.

9    You are referring to another Exhibit at the affidavit.

10   I believe it's Exhibit, the Exhibit which shows the

11   products and is Exhibit 17 to the sworn statement which

12   is the document of the...and...I mean...

13   MR. NEGRON:

14        Q    Okay. Are your referring when you, in your

15   paragraph 10, when you make a conclusion, am I correct in

16   stating that this is a conclusion?

17        A    Yes.

18        Q    Okay. You reach this conclusion based on what?

19   Basically on the T2000 beds or any other products,

20   please?

21        A    Basically on the T2000 beds.

22        Q    Okay. And when you get to this conclusion, you

23   are referring to paragraph 3 and 4?

24        A    Yes.

25        Q    Okay. Let's see paragraph 3. What was the

212

    date of the documents that you were reviewing when you make this statement? What was the date of the documents that you were referring to you recall?

    A    No, I don't.

    Q    No. Okay. Do you know for a fact that this price, the distributor cost to Plaintiff from Defendant..

MR. McCULLOCH

    Where's that is?

MR. NEGRON:

    I'm sorry, this is just...

MR. McCULLOCH

    This is the price that you have on the document she gave to us?

MR. NEGRON: (Cont.)

    Q    Okay. Okay. The cost from Plaintiff to you. Okay? Then you say that from the period of August 1998 to December, Medex had 191 separate sales of the T2000 beds. What were the prices that they were sell to Medex?

    A    As far as to...

    Q    No, no, no, I'm sorry. She makes an affidavit, I'm asking her, did she had the prices when she wrote and sworn this statement, did she have the prices that Medex was selling to other people, this is what she said here...

    A    Yes.

70

    Q    ...was it lower than that?

    A    Absolutely.

    Q    Do you recall which price was it?

    A    As low as three hundred and ninety nine...

    Q    Okay.

    A    ...four hundred and nine, four hundred and fifteen.

    Q    You know the reasons for that pricing?

    A    No, I don't.

    Q    But it was different prices or different bidders? Did you asked Defendant in this case...

MR. McCULLOCH

    Did she...

MR. NEGRON: (Cont.)

    Q    Did she, did she called Tuffcare and...

    A    No.

MR. McCULLOCH

    I don't know...

MR. NEGRON:

    Q    I'm asking her, do you called Tuffcare and tell them if they could lower that price?

    A    No, I did not.

    Q    Okay.

MR. McCULLOCH

    The price...

214

MR. NEGRON:

    I'm talking the price that she is quoting here, that was the price...

MR. McCULLOCH

    That's the price that you gave us in the consent...

MR. NEGRON:

    Okay.

MR. McCULLOCH

    ...Did she called

MR. NEGRON:

    If you are objecting to the question, please object it, because...

MR. McCULLOCH

    I'm objecting to the form of the question, yes.

MR. NEGRON: (Cont.)

    Q   Okay. Thank you. Besides this one hundred ninety one separate sales of the 2000 beds, do you recall any other items involved?

    A   No.

    Q   Ms. Figueroa, at this point in time, are you selling a product compatible, the same sort of products compatible or comparable products like the 2000 beds?

    A   Yes.

    Q   Yes. What's the brand name of that?

    A   Smith & Davis.