Q    Is it produced by Graham-Field?

    A    Yes, it is.

    Q    It is. What are the prices rate, let's say in 1999, did the price varied for the dealers?

MR. McCULLOCH

    Objection to the form of the question.

MR. NEGRON:

    Q    What was the price that you set for that bed in 1999 for the dealers?

    A    Four hundred and thirty five.

    Q    Was this a set standard price?

    A    No.

    Q    No.

    A    That was like the lowest price.

    Q    Lowest price. What was the highest if you recall?

    A    Four fifty.

    Q    So the price depended on the dealer you were selling?

    A    Yes.

    Q    Okay.

    A    And the quantity.

    Q    And the quantity. Okay. And then, were these same prices in 2000, as to April the 30th?

    A    Yes.

73

1    Q    In 1998, you recall the prices?

2    A    1998 it would have gone as low as four fifteen.

3    Q    This difference in prices, will they be only
4    accounted for because of the quantity involved?

5    A    Yes.

6    Q    The terms of payment do no affect the prices?

7    A    In some cases, yes.

8    Q    If you are paying COD, there would be lower
9    prices?

10    A    Correct. Or in ten days.

11    Q    Ten days. I think we are finishing, Counsel.
12    Ms. Figueroa, you mentioned at the beginning of the
13    deposition that the main accounting of the corporation,
14    of the Puerto Rico branch, subsidiary, is done in the
15    States, am I correct?

16    A    Correct.

17    Q    Okay. But you still have a checking account in
18    Puerto Rico?

19    A    Yes.

20    Q    What use you have for the account?

21    A    In Puerto Rico?

22    Q    Yes.

23    A    For the excise taxes, any repair maintenance
24    that we need to do or temporary help, we hire temporary
25    help. But basically for any routine and maintenance and

217

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

GRAHAM-FIELD, INC. AND
GRAHAM-FIELD EXPRESS (PUERTO RICO), INC.

Plaintiffs,

v.

TUFFCARE, INCORPORATED,

Defendant.

CIVIL NO. 98-1306

## AFFIDAVIT OF SARA FIGUEROA IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

SARA FIGUEROA, being duly sworn, deposes and states:

1. I am Regional Vice President for Graham-Field Express (Puerto Rico) Inc. ("GFE"), a Plaintiff in this action, which is a wholly owned subsidiary of Graham-Field, Inc. ("Graham-Field"), which is the other Plaintiff in this action.

2. I make this Affidavit in support of the motion by Graham-Field and GFE (collectively, "Plaintiffs") for a Temporary Restraining Order and a Preliminary Injunction restraining Defendant Tuffcare, Incorporated ("Tuffcare") from distributing its products in Puerto Rico other than through Plaintiffs.

3. Plaintiffs are in the business of distributing health care products. In September, 1996, they acquired the assets of VC Medical Distributors, Inc., a Puerto Rico corporation that distributed health care products in Puerto Rico.

1

EXHIBIT
1

218

4. Pursuant to an Agreement dated October 18, 1990, VC Medical Distributors, Inc. had become the exclusive distributor in Puerto Rico for Tuffcare, Incorporated ("Tuffcare"), a manufacturer of durable health care products, such as wheel chairs and hospital beds. For six years thereafter, until the acquisition by Plaintiffs, VC Medical Distributors, Inc. promoted the products of Tuffcare very extensively and successfully in Puerto Rico so that the Tuffcare name and its products became well-known and well-accepted in Puerto Rico. Thereafter, GFE continued this promotion and representation of Tuffcare in Puerto Rico.

5. I have been employed by Plaintiffs for approximately 8 years.

6. I have access to business records of the Plaintiffs. From those business records I know the purchases made for resale by GFE from Tuffcare exceeded $200,000 during the 4 months remaining in 1996 after the acquisition of the Tuffcare line and and were at least $400,000 in 1997. I estimate that the prices at which these goods were sold was at least 15% higher than the purchase price.

7. By a fax dated December 30, 1997 I was notified by Tuffcare that it was unilaterally terminating Plaintiffs as its distributor for Puerto Rico. Thereafter, in February 1998, GFE sought to purchase some spare parts from Tuffcare for Tuffcare products that GFE had sold and that had to be repaired. Tuffcare refused to sell GFE anything, even though I told Tuffcare that GFE would even pay C.O.D. GFE had to obtain the spare parts by cannibalizing new Tuffcare products that GFE still has in stock.

8. To the best of my knowledge, Plaintiffs were and have been the sole distributors in Puerto Rico for products manufactured and sold by Tuffcare since about September 1996 when Plaintiffs had acquired the Tuffcare distribution rights by purchasing VC Medical Distributors, Inc.

2

219

## Irreparable Harm Is Occuring Now

9. The loss of Tuffcare and the products it manufactures and sells will cause irreparable harm to Plaintiffs because of the nature of the health care supply business here in Puerto Rico. GFE's customers in Puerto Rico are generally durable medical equipment dealers and they sell to hospitals, nursing homes and similar institutions. Each distributor of health care related products, including GFE, seeks to have as many product lines as feasible. This is advantageous to the prospective customer because it can do "one-stop" shopping from a visiting sales representative. This is also advantageous to the distributor because it can use the same sales representative, on the same sales call, to sell additional products. There is very little additional cost to a distributor such as GFE when it adds an extra line of products. Conversely, when a distributor loses a line of products, such as the Tuffcare line, there is very little reduction in the overhead for sales representatives and sales calls but there can be a very significant drop in sales volume. The Tuffcare line represented a material and significant part of the business of GFE. This was immediately reflected in a reduction in GFE's sales for February, 1998.

10. The distributor that has the most complete line of health care related products is more likely to be able to gain access to the purchasing agents for the large dealers which are GFE's biggest clients. The distributor that has few lines, or has gaps in its product lines, has a more difficult time gaining access to such persons and, when the sales representative for such a distributor does gain access, that sales representative will not be able to make as many sales or as much in sales because of the gaps in the product lines or the narrow range of products offered.

3

**220**

11. For these reasons GFE, and others like GFE, have sought to gain distribution rights to a broad array of quality products. Tuffcare has a fine line of products and its products have been made very popular and well-accepted in Puerto Rico through the efforts of VC Medical Distributors, Inc. and through the efforts of GFE.

12. The loss of the Tuffcare line, even for a short time, has caused and will continue to cause irreparable harm to GFE's business. If GFE does not have access to the Tuffcare line of products, GFE may be forced to try to promote other lines from other manufacturers and/or promote, merchandise, market and sell other products competitive to those of Tuffcare. This will be very difficult to do, especially because GFE and its predecessor have already devoted many years and hundreds of sales calls to develop Tuffcare. It, in effect, would require GFE to compete against the acceptance level and reputation of Tuffcare that GFE and its predecessor had very much created. It would put GFE in the impossible position of having to detract from the sales of Tuffcare products and the reputation of Tuffcare, so that GFE could try to maintain its same level of business without the benefit of the Tuffcare line of products. If GFE were successful in maintaining its business level without the Tuffcare line of products, it would be doing so by reducing or minimizing the value of the very asset that it is trying to recover in this legal action. Theoretically, if GFE were to be totally successful in developing other lines in its competitive efforts against Tuffcare, GFE would take over the entire market with products competitive to the Tuffcare products and the distribution rights to the Tuffcare line of products would not be worth anything. In the end, if GFE has to wait months or years for a judgment to have the Tuffcare line of products restored to it, the value of any ultimate judgment, even

221

though it be in favor of GFE, could be greatly diminished. Furthermore, GFE's sales representatives would lose credibility. A short time ago these representatives were promoting Tuffcare products as a "best buy". Without the Tuffcare line, they will have to promote some other company's products as the "best buy". Even assuming they can do that, when Graham-Field and GFE prevail in the ultimate judgment, these sales representatives will again be promoting the Tuffcare line as the "best buy". This kind of switching would greatly detract from the overall credibility of GFE's sales representatives but, absent the issuance of the Temporary Restraining Order and Preliminary Injunction, this is precisely what they would have to do.

13. Conversely, if GFE does not promote other products competitive to Tuffcare's products then GFE's ability to gain access to purchasing agents will be greatly diminished, and GFE will lose sales. As it loses sales it will have to reduce its work force, which may cause it to lose still more sales.

14. The very immediate problem confronting GFE is what to tell customers who know that GFE represents Tuffcare and who ask for Tuffcare products. If these customers learn that GFE has lost a line of products, GFE will suffer a loss of reputation in an industry where it is very important to be perceived as a "winner", and as a company increasing its lines, not one that is losing its lines. Customers want the comfort of knowing that the distributor that is selling products to them will be there to service those products. A distributor that is losing large product lines does not appear as stable as one that is adding product lines. Practically

5

perception and GFE will suffer irreparable harm for this reason also, with regard to all the lines for which it is distribor.

15. This is a very competive business. Graham-Field has grown rapidly by having a very broad line or products. GFE desires to grow rapidly in Puerto Rico by keeping it existing lines and adding new lines. It acquired the lines of VC Medical Distributors, Inc. for the purpose, and it is currently seeking to acquire even more distributors here in PuertoRico and add their lines of products to its existing lines. And GFE is doing this in the legally proper, but far more expensive method, i.e., by purchasing these rights. Losing Tuffcare and its products will be a giant step backwards for GFE in Puerto Rico and for GFE to have to wait a long time for the restoration of the Tuffcare lines would be very harmful to the business of GFE.

## There Is A Liklihood Of Success

16. I am aware of Law 75 and from what I understand about that law, a distributor of products in Puerto Rico that has made the market for those products, and developed the customers for those products, cannot be unilaterally terminated by the manufacturer without "just cause". There was no "just cause for Tuffcare to terminate GFE.

17. The Notice of Termination to Plaintiffs was dated December 30, 1997. It is Exhibit A to this Affidavit. The notice states that Tuffcare was terminating Plaintiffs for their failure to pay invoices on time, but at the time Tuffcare sent this notice, there were no outstanding invoices from Tuffcare to be paid. On December 10, 1997, Plaintiff had paid $151,135.35 toTuffcare, and that that had been the only invoice outstanding as of the time it was paid.



18. Prior to receipt of the Notice of Termination Plaintiffs had never received any notice from Tuffcare advising Tuffcare that termination was even being considered. The only other notice that had been sent to Plaintiffs from Tuffcare, had come from the Pompano Beach, Florida offices of Tuffcare. That notice, dated November 19, 1997, is Exhibit B to this Affidavit. This Pompano Beach, Florida office of Tuffcare was the office with which Plaintiffs did most of its business. That notice (Exhibit B) advised that the sanctions for failing to pay on time would be that "all order (sic) will be held until payment is made to the current date." It also advised that Tuffcare would charge 18% interest on an invoice if the invoice were not paid in 90 days.

19. During the entire time that Tuffcare had done business with Plaintiffs it never advised Plaintiffs that termination was "in the picture" as a sanction and it had never charged Plaintiff 18% interest on any invoice, and it had never held up shipment of any order for failure to pay outstanding invoices.

20. There is also another major difference between the payment terms as set forth in the two letters from Tuffcare. The notice dated November 19, 1997 from Tuffcare's Pompano Beach office had stated that "your terms are Net 30 days". (Exhibit B) The termination notice dated December 30, 1997 from Tuffcare's headquarters office had stated that "our terms are Net 10 days". (Exhibit A)

21. The notice dated December 30, 1997 stated: "if we don't receive your check by 1-02-97, we will cancel the order and assume that you have no interesting (sic) in carrying Tuffcare products any more." (Exhibit A).

7

**224**

As of December 30, 1997 there were no invoices outstanding for Tuffcare. If there was an order outstanding, and I do not believe there was, it is inconsistent for Tuffcare to state in the beginning of the letter that the terms are "Net 10 days" and in the same letter demand payment prior to shipment.

22. The letter dated Tuesday, December 30, 1997 came from the Tuffcare headquarters in California. This location is four (4) hours behind Puerto Rico time as of the time of year when it was sent.. This notice was faxed when Plaintiffs' Puerto Rico office was already closed, to a person, Vicente Guzmán, Jr. who had already submitted his resignation. The earliest that Tuffcare could expect this notice to be received was New Year's Eve, Wednesday, December 31, 1997 and, by the notice, Tuffcare was demanding a check, for an amount not identified and an invoice not identified, and they were demanding that the check be received by Tuffcare in California by Federal Express by January 2, 1998, the day after New Year's Day. Thursday, January 1, and Friday, January 2, 1998 were holidays in Puerto Rico, the former because it was New Year's Day and the latter because Governor Rossello had made it a holiday in Puerto Rico.

In sum, Tuffcare, by its December 30, 1997 letter, was demanding that Plaintiffs perform an impossible act and trying to place the blame on Plaintiffs ("We will assume... that you have no interesting (sic) in carrying the Tuffcare products any more") because Plaintiffs could not perform the impossible.

This is not good faith and this is not "just cause" to terminate a relationship that had been "mutually satisfactory" (See Exhibit B) since October 19, 1990.

8

225

23. I believe the decision to terminate Tuffcare was made long before December 30, 1997 and that the purported termination on December 30, 1997 was a sloppy attempt to cover-up what was really a blatant violation of law.

24. In November 1997, Vicente Guzmán, Jr. President of GFE, had advised me that Tuffcare had an attractive new product, a semi-automatic hospital bed that was very competitively priced. I expected to see information on this product so that our sales representatives could learn about it and start selling it. There is generally a lead time of weeks or months from the time a manufacturer has a new product until the time the distributor can sell the product. This is so the sales staff can receive literature and pictures on the product, and so that the distributor can learn about quantities available, lead time for shipping (i.e., when the product can arrive in Puerto Rico), and so the distributor can set its prices for sale to customers.

25. This product never came to Plaintiffs for distribution.

26. Instead, in January 1998 a new company, Medex, was selling this product and other products for Tuffcare in Puerto Rico. Medex set up its business on the same road as the road on which Plaintiffs' Puerto Rico facility is located. It was less than 1 mile from Plaintiffs' facility. Hilda Salgado "retired" from her position as Operations Manager for GFE in early January 1998 and in January 1998 she was working at Medex, soliciting Plaintiffs customers to be customers of Medex.

27. For all the above reasons, I believe that Tuffcare's decision to terminate GFE was made prior to December 30, 1997 and that the decision to sell the new semi-automatic bed and other Tuffcare products through Medex was made before Tuffcare terminated Plaintiffs.

28. I believe that it would have been impossible for Tuffcare to have selected a new distributor and have that distributor selling its products, including its new products, in Puerto Rico, as of January 1998, unless it had started the process prior to December 30, 1997.

29. I know that Medex was competing against Plaintiffs and selling Tuffcare products because customers told me about it and because a Medex promotional flyer that I obtained indicated in the flyer that Medex was the distributor for Tuffcare.

30. For all the foregoing reasons Plaintiffs ask the Court by this legal action to restore it to them proper position as distributor for Tuffcare products in Puerto Rico, and to issue the Temporary Restraining Order and the Preliminary and Permanent Injunction that have been requested.

_____
SARA FIGUEROA

Aff. No. -147-

Sworn to before me this 26th day of March, 1998 by Ms. Sara Figueroa Pimentel, of legal age, married, sales manager, resident of Guaynabo, Puerto Rico, identified by New York State Driver,s Licence NO. 854 225 459.



10

227