IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

GRAHAM-FIELD, INC. AND
GRAHAM-FIELD EXPRESS (PUERTO RICO), INC.

Plaintiffs,

v.

TUFFCARE, INCORPORATED,

Defendant.

CIVIL NO. 98-1306 (DRD)

**Plaintiffs' Motion For An Order Of Contempt,
A Fine For Contempt And Other Relief**

## Introduction

This is a motion by Graham Field Inc. and Graham Field Express (P.R.) Inc. ("Plaintiffs") for an order of contempt and an interim award in the amount of at least $20,000 per month, from the date of 6/4/98, when the Court issued its Order that has been violated, to the date of the Court's Order granting this motion, which is the minimum amount by which Tuffcare, Inc. ("Defendant") has been in contempt of this Court's Order of June 4, 1998. Plaintiffs also seek a declaratory judgment, pursuant to Rule 57, Federal Rules of Civil Procedure ("Fed.R.Civ.P."), that Plaintiffs have been terminated as a distributor for Defendant, in violation of Law 75, 10 L.P.R.A. §278a, or, alternatively, an Order granting for partial summary judgment, pursuant to Rule 56, Fed.R.Civ.P., to the same effect. Plaintiffs also seek interim remedy pursuant to the Robinson-Patman Act, 15 U.S.C. §§1-15 and its local law equivalent, 10 L.P.R.A. §§ 263 -266. The relief is fully necessitated by Defendant's total disregard for, and contempt of, the Court's

(File: Contempt.Int)

1

**240**

approximately 7% of what Medex' annualized sales have been during the Contempt Period.

**D. The Court's Order required the "same terms" for goods for Plaintiffs as was accorded to Medex. Ex. 1, ¶ 1, the time for payment is a term covered by the Order.**

Defendant did not do that. During the course of this case Defendant has sought to make much of delays in payments by Plaintiffs. The Court's Order, at Defendant's insistence, specifically required that Plaintiffs pay within ten (10) days after receipt of the merchandise. Ex. 1, ¶2. However, the Order further stated that Plaintiffs were required to pay "... within ten (10) days provided that those are the same terms that all other distributors of Tuffcare, Inc, in P.R. including but not limited to Medex of P.R. pay." Id.

Medex did not pay in ten (10) days of receipt of the merchandise. It did not pay against invoices at all. All the shipments to Medex during the Contempt Period, and prior to the Contempt Period, were done as intra-company transfers.

In Exhibit 14 Plaintiffs have presented a sampling of how Defendant operated.[5] In this Exhibit is Invoice #34233, dated 04/16/98 (Pre-Contempt Period). It shows "Proj. Transfer #29." Invoice #35728 dated 05/28/98 (also Pre Contempt Period) shows "Proj. Transfer No. 49." Invoice #36824 dated 6/25/98 (Contempt Period) shows "Transfer No. 60." By the time Defendant was up to invoice #103481 dated 12/03/98, it was up to "Transfer No. 120".

The shipping documents for each of the 25 invoices relating to transfers during the Contempt Period are included with Exhibit 11. Neither the invoices nor the shipping documents show any payments at all by Medex to Defendant against invoices.

---

[5] This subject is also discussed later in this memo, as part of the discussion of the testimony by Jesús García, a principal of Innovation Marketing, which had been a sales representatives for Defendant in late 1997 and early 1998.

241

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

GRAHAM-FIELD, INC. AND
GRAHAM-FIELD EXPRESS
(PUERTO RICO) INC.

Plaintiffs,

CIVIL NO. 98-1306 (DRD)

.v.

TUFFCARE, INCORPORATED,

Defendant.

## PLAINTIFFS' SUPPLEMENTAL RESPONSE TO DEFENDANT'S FIRST INTERROGATORY

These responses supplement Plaintiffs' previously submitted objections to Defendant's First Interrogatory and Plaintiffs' responses to Defendant's First Interrogatory.

**Interrogatory 2. Supplemental Response.**

Witnesses with knowledge of the facts alleged in the Amended Complaint, filed on 4/16/98, are set forth in **Part A**. Defendant's First Interrogatory, dated August 21, 1998, sought the identity of persons believed to have knowledge of the facts alleged in the Complaint. The paragraphs and subparagraphs of the Complaint are set forth in **Part B**, and the number in front of each witness identified in Part A means that Plaintiffs believe that such person has information about the facts alleged in that paragraph or subparagraph of the Complaint. Interrogatory 2 also sought a summary of the facts about which the witnesses had knowledge.

**Part A.**

1.  Geraldo Cabrera

1

promoting those products of the Defendant, Defendant created anew a relationship by which the Plaintiffs were and are the exclusive distributors of the Defendant's products in Puerto Rico. Defendant permitted the Plaintiffs to continue to act as though they continued to be the exclusive distributor for the Defendant's products in Puerto Rico, including undertaking the same actions and making the same kinds of investments that had been made when VC Medical had been the acknowledged exclusive distributor of the Defendant, so Defendant is now estopped from unilaterally changing this exclusive relationship.

3. This is also an action for violation of Law 75, even if the Court were to find that Plaintiffs were not exclusive distributors for the Defendant from on or about September 1996. It is admitted by Defendant that Plaintiffs served as distributors for the Defendant. Even if that relationship were found by the Court to be only a non-exclusive arrangement, the Defendant is in violation of Law 75, because Law 75 protects non-exclusive distributors also. It does not permit the principal, in this case, Defendant, to interfere with, or to terminate, the established relationship without good cause. The Defendant interfered with, and effectively terminated, the relationship that had existed between the Plaintiffs and the Defendant, no matter whether that relationship is considered exclusive or non-exclusive, by wrongful actions, including those set forth below. These acts constituted a violation of Law 75, and separate violation of the violation of the implied covenants of good faith and fair dealing that exist under Law 75 and in contracts generally under the laws of Puerto Rico, pursuant to the Puerto Rico Civil Code, 10 L.P.R.A. App. I, ¶1308.

i.) Starting in October, 1997, Defendant contracted with another company, Innovation Marketing Inc.("Innovation Marketing"), to be Sales Representative for the Defendant's products

[Pu]erto Rico. Jesus Garcia was one of the principals of Innovation Marketing. He and his company were ordered to sell the Defendant's products in Puerto Rico, and to do so at prices that were lower than the prices at which that the Plaintiffs could and did charge to its customers and clients in Puerto Rico. In addition, Defendant had this sales representative sell Defendant's products on terms that were better than those offered by the Plaintiffs. Defendant and Jesus Garcia and Innovation Marketing collaborated to ascertain the prices being charged by the Plaintiffs to its customers for the Defendant's products, and the identity of the Plaintiffs' customers. Jesus Garcia and Innovation Marketing were ordered by the Defendant to "beat" the [compet]ition, and the Plaintiffs were deemed to be "competition", even with respect to the [p]roducts of the Defendant that Plaintiffs were selling as a distributor for the Defendant. Plaintiffs were at a competitive disadvantage against the Defendant. Defendant already knew much [info]rmation about Plaintiffs' practices because the Plaintiffs were the dealer for the Defendant. [T]he Defendant issued the suggested re-sale prices, and in many other methods acted in a [f]iduciary capacity with respect to the Plaintiffs. Because of this relationship, Defendant knew [a]nd was entitled to know much about how Plaintiffs sold and serviced the products of the [D]efendant in Puerto Rico. Jesus Garcia and Innovation Marketing, did not have to pay for [D]efendant's products. Defendant shipped them into Puerto Rico, warehoused them, and had [th]em available for delivery, when Innovation Marketing received orders.

    ii.) Starting in about November, 1997, Defendant set up its own company, Medex, and shipped its products to Medex, and Medex "sold" the Defendant's products in direct competition against the Plaintiffs. Defendant "sold" its products to Medex at substantially lower prices than the prices it sold the same products to Plaintiffs. For example, during

this period from about November, 1997, until or about June, 1998, Defendant "sold" its T2000 bed to Medex for $229.50. The price charged to the Plaintiffs for the same product was $369.00. As a result, Medex was able to sell the Defendant's products at prices substantially below the cost paid by the Plaintiffs for the same products.

iii.) During this same period, and even for the time period after June 1998, Defendant engaged in sham "sales" to Medex. Medex did not pay against invoices, not in 10 days from delivery or 30 days of delivery. Defendant shipped goods to Medex, and sent invoices to Medex. Medex then sold Defendant's products to the same customers who had been Plaintiffs' customers. When these customers paid Medex, Medex regularly made deposits of the amounts received from its customers in Puerto Rico to bank accounts maintained in Puerto Rico. However, the checkbooks for those accounts were not in Puerto Rico. They were in California, at the offices of Calvin Chang. Calvin Chang was and is the Chief Executive Officer of Medex. Calvin Chang and his brother, Joseph Chang, were and are the owners of Medex. Calvin Chang's mother is the owner of the Defendant. Calvin Chang was and is the Vice-President of Sales for Defendant, and his brother, Joseph Chang, was and is the Vice-President of Operations of Defendant.

iv.) Even though Medex did not have to pay within 10 days or 30 days, Defendant shipped its goods to Medex without regard to when or how Medex paid for those goods. With regard to the Plaintiffs, however, Defendant used failure to pay in a timely manner as an excuse to cease making shipments to the Plaintiffs. By at or around December 1997, Defendant had a warehouse, which was staffed by an employee of Defendant, Jose Castillo, who had been sent by Defendant from California to Puerto Rico. Defendant had

8

Plaintiffs further theory for entitlement is that even if they were not the exclusive distributor for the Defendant's products in Puerto Rico for the time period subsequent to September, 1996, they certainly were the distributor, in fact, for the Defendant's products in Puerto Rico commencing in September, 1996, that they functioned in that capacity, and that they had rights and entitlements protected by Law 75 as a distributor for the Defendant. Defendant abrogated those rights and entitlements, without just cause, and usurped unto itself the business that the Plaintiffs procured by purchase, and had continued to develop as the distributor for the Defendant. Defendant did this by first setting up its own method for sales by using Jesus Garcia and Innovation Marketing as a sales representative to sell Defendant's products, and then establishing a sham method for usurping the Plaintiffs' business as distributor for the Defendant's products in Puerto Rico. Defendant was doing business in Puerto Rico, in direct competition with the Plaintiffs, by using a fiction, i.e., that it was only distributing its products through another distributor, i.e., Medex Corporation.

Medex was merely a tool used by the Defendant. The Defendant totally controlled Medex.

Defendant violated Law 75 because it sold its products in Puerto Rico in competition against the Plaintiffs at prices lower than those that it charged to the Plaintiffs. The Plaintiffs could not buy the Defendant's products, and re-sell those products in Puerto Rico, when the Defendant was selling those products in Puerto Rico at such low prices. In addition, the Defendant used a sham excuse for refusing to sell its products to the Plaintiffs. All of this was in violation of Law 75, and in violation of the implied covenant of good faith and fair dealing that is incorporated by operation of the laws of Puerto Rico into any contract.

When the Defendant was required by its Agreement and the Court Order of June 4, 1998

12

Defendant, and by Vicente Guzman and Hilda Salgado, as "owners" of VC Medical on October 15, 1990. Exhibit 1.

2. The Exclusive Distribution Agreement between VC Medical and Defendant provided that "The Distributor is the exclusive distributor in Puerto Rico." (Par. 1). "All sales leads from Puerto Rico will be refer to the Distributor." (Par. 2). "The distributor agreed to promote and sell wheelchairs and related products only for the Manufacturer."(Par. 3). "Distributor must purchase average of $10,000 per month in order to maintain the exclusive status. Performance will be reviewed every 3 months." ( Par. 4.) "This contract is valid until September 30, 1991. The contract can be renew by increasing sales performance to $15,000 per month." (Par. 5.) Exhibit 1.

3. VC Medical and Defendant operated under the above-referenced Exclusive Distribution Agreement at least until or about August, 1996.

4. VC Medical maintained the level of purchases that was needed to maintain its status as exclusive distributor for the Defendant's products in Puerto Rico.

5. During August, 1996, Plaintiffs negotiated to purchase VC Medical. A principal wner of VC Medical was Vicente Guzman, Jr.

6. As of August, 1996, Graham-Field, Inc. manufactured and sold products that competed against some of the products that were manufactured and sold by Defendant. As part of the acquisition of VC Medical, Graham-Field, Inc. had established Graham-Field Express ( Puerto Rico) Inc. ("GFE").

7. After the acquisition of VC Medical, Graham-Field, Inc. used GFE to continue the VC Medical business that was acquired.

8. If VC Medical, or its successor, sold in Puerto Rico the products that Graham-Field, Inc.

14

81. During the period from the Agreement and Order of June 4, 1998 to December 31, 1998 there were twenty-four (24) invoices from Defendant to Medex. Exhibit 38. A review of those invoices shows that the Defendant invoiced to Medex at prices lower than the prices that the Defendant had provided to the Plaintiffs, and that it did this on a regular basis, on 32 of the 52 items that Defendant had offered to sell to the Plaintiffs pursuant to the Agreement and Order of June 4, 1998. Had the Plaintiff purchased these same items, at the prices that had been quoted to the Plaintiffs by the Defendant, the cost to the Plaintiffs would have been $59,273.00 higher than the prices at which Defendant had invoiced Medex. Exhibit 38.

82. The Agreement and Order of June 4, 1998 required that the Plaintiffs be accorded the same terms for payment as other distributors of Defendant in Puerto Rico, including the terms for Medex. Exhibit 26.

83. The documents produced to Plaintiffs by the Defendant pursuant to the Court's Order of January 29, 1999, demonstrate that Defendant shipped products to Medex as intra-company transfers. The documents are marked that way. Exhibit 24. An invoice (35728) dated 5/28/98 is Project Transfer No. 49; an invoice (36824) dated 6/25/98 is Project Transfer No. 60; the last invoice (103481) for the period for which the Defendant provided records ( i.e., to 12/31/98) dated 12/03/98 is Project Transfer No. 120. None of these invoices are marked "Paid" or "Okay To Pay" because there was no payment to be made.

84. Medex did not pay these invoices, not in 10 days, as was required of the Defendant, by the Court's Order of June 4, 1998, nor did it pay them at all. Defendant continued to do what it had been doing since it started selling its products in Puerto Rico. It shipped them to Medex as intr-company transfers. In fact, Calvin Chang had the checking and bank registers for Medex with him

Defendant sold 1139 units of the T2000 bed during this period of August to December, 1998. Exhibit 40.

91. During this period, and the entire time that Medex has been operating, Medex has been controlled by the Defendant. The prices that Medex charged to potential customers was set by Calvin Chang, the Vice-President of Sales for the Defendant, and the CEO of Medex, set the prices at which Defendant invoiced Medex, and he set the prices that Medex charged customers for Defendant's products.

92. During this period from 6/4/98 to 12/31/98, Medex had sales of Defendant's products in the amount of $1,805,840.64. Exhibit 42. Annualized, this is $3,085,714.28 per year.

**Defendant's Activity Subsequent To December 31, 1998**

93. Defendant did not produce any records for the time period subsequent to December 31, 1998. Plaintiffs sought an Order of Contempt because the Defendant would not produce records for the time period subsequent to December 31, 1998, especially because the Court had issued an Order on January 29, 1999 requiring that the Defendant respond to all the document requests that had been asserted by the Plaintiffs as part of the Plaintiffs first Requests For Production Of Documents. Exhibit 5, 6.

94. Plaintiffs are entitled to an adverse inference against the Defendant because it has failed and refused to produce documents in its control for the period subsequent to December 31, 1998. That adverse inference is that the Defendant has engaged in the same kind of conduct, and inflicted the same amount of damages, on a monthly basis, for the 25 month period (1/1/99-02/02) since December 31, 1998 as had been inflicted during the 7 month period from June 4, 1998 to December 31, 1998.

Respectfully submitted,

Graham-Field, Inc. and Graham-Field Express (Puerto Rico) Inc.

By: _____
Kenneth Mc Culloch
P.O. Box 9023914
San Juan, Puerto Rico 00902-3914
Tel: 787-754-9191
Fax. 787-764-3101

New York Office:

Ballard, Rosenberg, Golper & Savitt
909 Third Avenue, 18th Fl.
New York, N.Y. 10022
Attn:   Kenneth Mc Culloch

Tel. 212-453-2710
Fax.212-644-8400

Dated: August 5, 2002.