## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| GRAHAM - FIELD, INC., et al. | CIVIL NO. 98-1306 (DRD) |
| Plaintiffs | CIVIL ACTION |
| Vs | |
| E-1 Enterprises, Inc., et. al., | |
| Defendant | |

### E1's PRETRIAL MEMORANDUM

TO THE HONORABLE COURT:

COMES NOW defendant E 1 Enterprises, Inc. ("E1"), represented by the undersigned attorney, and most respectfully STATES, ALLEGES and PRAYS:

Pursuant to L.Cv.R.16(d) E1 hereby submits its proposed pre-trail order.

1.   Names, mailing and email addresses and telephone and facsimile numbers of all attorneys involved in the litigation:

a.   Mr. Kenneth McCulloch, counsel for plaintiffs, 516 5th Avenue, 12th Floor, New York, New York 10036; kmcculloch@brgslaw.com, Tel. 212-398-9508, Fax 212-398-9512.

b.   Mr. Ignacio Fernández de Lahongrais, counsel for E1, 239 Arterial Hostos, Suite 202, Capital Center Sur, Hato Rey, Puerto Rico 00918-1475; ifernandez@prtc.net, Tel. 787-758-5789, Fax 787-754-5789.

2.   E1's Factual Statement:

Graham Field, Inc., et. al., v. E 1 Enterprises Inc., et. al.,                    E1's Pre Trial Memo
98-1306 (DRD)

a.      At all times relevant to the complaint, Plaintiff Graham Field and its wholly

owned subsidiaries (including co plaintiff Graham Field Express) manufactured and

distributed medical, surgical and a broad range of other health care products into the

home health care and medical & surgical markets through a vast dealer network,

consisting of approximately 18,500 customers (hospital, nursing home, physician and

home health care dealers) in North America.  Plaintiffs also increased its presence in

Central and South America, Canada, Mexico, Europe and Asia.  Plaintiffs market

approximately 45,000 products under its own brand names and under supplier's names.

b.      As of December 31, 1997 plaintiffs reported to the Securities Exchange

Commission assets of $547,118,000.  Net revenue was a staggering $263,143,000.  In

comparison, defendant's sales were approximately $20 million.

c.      At all times relevant to the complaint plaintiffs products competed with

defendant Tuffcare.

d.      The roots of this case can be traced back to 1990.  In October 1990 defendant

Tuffcare entered into a distribution agreement ("VC Agreement") with VC Medical

Distributor ("VC Medical").  The VC Agreement was signed by three persons.  Mr.

Calvin Chang representing Tuffcare and Mr. Vicente Guzman and Ms. Hilda Salgado

representing VC Medical.  Mr. Guzman was the president of VC Medical.

e.      The VC Agreement states, in part, that the "Distributor (VC Medical) agreed

to promote and sell wheelchairs and related products only for the Manufacturer (Tuffcare)." Related products means wheelchairs accessories and parts. The VC Agreement was limited to promoting and selling wheelchairs.

f.    **The exclusivity conferred by the VC Agreement was limited to wheelchairs.**

That is, VC would only sell Tuffcare wheelchairs and Tuffcare would sell wheelchairs only to V.C. In turn, VC Medical did not sell competing wheelchairs, and Tuffcare did not market these same products through any other company in Puerto Rico.

g.    Mr. Guzman first came into contact with Tuffcare because he was looking for a company that would manufacture or **wheelchairs**. When negotiating the VC Agreement, Mr. Guzman and Tuffcare's Calvin Chang began did not talk about anything else. Thus, the distribution by V.C. Medical of additional products manufactured by Tuffcare (i.e. beds) was not discussed by the principal signatories of the VC Agreement.

h.    VC also purchased from Tuffcare canes and walkers, and related products on a **non-exclusive basis**. The VC Agreement did not relate to those other products sold by Tuffcare to VC on a non-exclusive basis.

i.    In signing the VC Agreement, it was crucial to Tuffcare that VC did not sell competing wheelchairs.

j.    As to other products no covered by the VC Agreement, VC Medical purchased

beds, and other products from other manufacturers and <u>never</u> bought beds from Tuffcare.

k.     It is decisive to remember that **VC Medical never purchased beds from Tuffcare**. Not even on a non exclusive basis. Instead, VC bought its beds from plaintiff Graham Field. To make this point even more obvious, at the time VC Medical was operating, <u>Tuffcare did not even have beds available for sale</u>.

l.     In 1996 plaintiff Graham Field entered into negotiations with VC Medical to purchase all of VC's assets and set up its own distributor in Puerto Rico. However, in order for the sale to take place, plaintiff Graham Filed demanded from VC Medical that it renegotiate the VC Agreement. The reason was that the VC Agreement, as it stood, would prevent Graham Field from introducing its competing Celtylite and Everest & Jennings wheelchairs.

m.     Graham Field was concerned that the VC Agreement prevented them from introducing their new Everest & Jennings wheelchairs into Puerto Rico. Mr. Guzman was told by Mr. Richard Kolodny, plaintiffs' legal counsel, that the VC Agreement could not remain in place as it would bar Graham Field from introducing its competing products on the island.

n.     Towards that end, Tuffcare and VC Medical **terminated** the VC Agreement by letter dated August 13, 1996. The letter specifically stated that they thereby

Graham Field, Inc., et. al., v. E 1 Enterprises Inc., et. al.,                    E1's Pre Trial Memo
98-1306 (DRD)

"terminate[d] the Exclusive Sales Agreement between VC Medical Distributors and Tuffcare signed in October 1990. Both company (*sic*.) will continue to do business at goodwill." That is, "Tuffcare agreed to sell the same products as before, **but not on an exclusive basis**."

o.    Therefore, Tuffcare agreed to continue selling its products to VC Medical on a non exclusive basis ("**the non exclusive *arrangement***").

p.    **At the time Mr. Guzman sold his corporation to GFE, there was no exclusive agreement of sales between VC and Tuffcare.**  The VC Agreement was terminated because Graham Field wanted to sell competing wheelchairs in Puerto Rico.

q.     In response to VC Medical's petition, on August 27, 1996 Tuffcare consented to the assignment of its <u>non exclusive *arrangement*</u> with VC Medical to GFE upon the closing of the sale of assets, pursuant to all the terms and conditions of the original agreement (net 10 days, minimum purchases of wheelchairs, etc...). In its August 27, 1996 letter Tuffcare specifically confirmed "that the Exclusive Sales Agreement is no longer in effect, and both company (*sic*.) will continue to do business at goodwill."

r.    This <u>new</u> relationship was an "open relationship."  GFE could continue to buy from Tuffcare on a non exclusive basis while at the same time GFE could sell its own competing products.

s.    In November 1997 Graham Field  purchased the wheelchair manufacturer

Graham Field, Inc., et. al., v. E l Enterprises Inc., et. al.,                E1's Pre Trial Memo
98-1306 (DRD)

Everest & Jennings.   Before Graham Field purchased Everest & Jennings, Tuffcare's

wheelchair price was lower that what Mr. Guzman could otherwise get.  Once GFE had

Everest & Jennings wheelchairs available for sale, Mr. Guzman was going to start using

them and stop buying Tuffcare wheelchairs.

t.      After Tuffcare found out about Graham Field's purchase of Everest & Jennings,

and its competing line of wheelchairs, it decided to set up MedEx in Puerto Rico.

u.      Mr. Guzman became the president of plaintiff GFE after the asset sale.  Mr.

Vicente Guzman, as president of GFE, continued ordering the same products from

Tuffcare that he had purchased when he was the owner of VC Medical on a non-

exclusive basis.  However, this was not done in a good faith effort to continue as

Tuffcare's non-exclusive distributor in Puerto Rico.

v.      After the Everest & Jennings purchase, Mr. Guzman was ordered by plaintiffs'

legal counsel, Mr. Richard Kolodny, and by plaintiffs' president, Irwin Selinger, to

decrease GFE's purchases of Tuffcare products until a short transition brought an

immersion of Graham Field products into the Puerto Rico market.  At that point, all of

Tuffcare purchases would cease.

w.      GFE kept purchasing Tuffcare products in a transition period, and only as a back

up, whereupon GFE bought less and less from Tuffcare for three main reasons:

        i.      Provide enough competition free time while GFE introduced into the

Graham Field, Inc., et. al., v. E l Enterprises Inc., et. al.,                E1's Pre Trial Memo
98-1306 (DRD)

Puerto Rico market competing lines from Graham Field, such as the Everest &
Jennings wheelchairs;

ii.    Convince Tuffcare that it did not need to establish a direct distribution in
Puerto Rico of its products;

iii.    Need to supply with other manufacturer's products due to Graham
Field's inadequacy in filling GFE's orders completely and on time.

x.    On several occasions Tuffcare's Calvin Chang expressed his concern to Mr.
Guzman of how GFE was going to keep on selling Tuffcare wheelchairs as its main
brand if the company was now manufacturing Everest & Jennings wheelchairs. By then,
it was understood that Graham Field wanted to market Everest and Jennings. *(i.e.
Plaintiffs' conflict of interest.)*

y.    At that time, Mr. Guzman was devoting time and effort in selling products that
competed with Tuffcare.

z.    After the asset sale, Calvin Chang also complained to Ms. Hilda Salgado that
GFE was not buying enough Tuffcare products and was late paying their invoices.
When Ms. Salgado told Mr. Guzman about Tuffcare's complaints, Mr. Guzman stated
that **GFE could not buy anymore of Tuffcare's beds or wheelchairs because
Graham Field had its own factories** (for competing products).

aa.    Contrary to plaintiffs' allegations that GFE made good faith efforts in

maintaining the distribution of Tuffcare wheelchairs, the fact is that Mr. Guzman was

<u>chastised</u> on several occasions by Mr. Irwin Selinger (Graham Field's president) and

Mr. Richard Kolodny (Graham Field's general counsel) for buying Tuffcare products.

bb.      In July 16, 1997, Mr. Irwin Selinger wrote a memo to Mr. Guzman wherein he

stated that "there is no reason to buy Tuffcare Wheelchairs when we own E & J

[Everest & Jennings] ... Please make sure that your entire staff abides by this memo."

cc.      Mr. Guzman understood this as an instruction to stop buying all wheelchairs

from Tuffcare.

dd.      As evidenced by a letter from Vicente Guzman to GF's Peter Wincour, dated

May 12, 1997, the fact is that GFE was at this time aggressively promoting the

competing Metro wheelchair, manufactured by GF, with the goal: "Take business no

matter what ... For this we will have to math (*sic.*) our competitor's prices."

ee.      Mr. Guzman testified in his deposition that Mr. Selinger (Plaintiffs' president)

ordered him to stop buying Tuffcare products because Graham Field had competing

lines that he was instead supposed to sell.

ff.      In a 9/23/97 memo from Vicente Guzman to Irwin Selinger, Mr. Guzman

summarized their strategy:

> When GF acquired VC Medical as part of the recquirements [*sic.*] to
> complete the transaction **we sent a letter to Tuffcare cancelling the
> exclusive distributor agreement between Tuffcare and VC Medical**.

Graham Field, Inc., et. al., v. E 1 Enterprises Inc., et. al.,                    E1's Pre Trial Memo
98-1306 (DRD)

> ... The only way that they can use another distributor or open operations
> here without any problems is if we don't buy from them. ... **In the case
> of the regular wheelchairs we can change all the business to E & J**
> but we have some others [sic.] products that we need to buy from them
> to provide service to some customers **until** E & J can have them ready
> for us. ... **I recommend to make one more order**. ... In this process ...
> **we can try to stop them through the court using the 75 law**.

> To which Mr. Selinger replied: "I definitely agree with your analysis on this,
>
> please go right away!"

gg.     This memo, as well as Mr. Selinger's response, memorialized plaintiffs' strategy

to drive Tuffcare out of the Puerto Rico market.  They wanted to avoid having Tuffcare

as a competitor in the Puerto Rico market and were afraid that perhaps Tuffcare would

become bigger than GFE.  As soon as they had available Everest & Jennings

wheelchairs, they were going to compete with Tuffcare.

hh.     In light of the above, plaintiffs' argument that the August 27, 1996 "non

exclusive *arrangement*" allowed GFE to sell its own competing products in Puerto Rico

while at the same time provided them with the exclusive distribution rights of

Tuffcare's products in Puerto Rico (thus, forbidding Tuffcare from selling its own

products in Puerto Rico) goes against the very essence of Law 75.  GFE's conflict of

interest is crystal-clear.

ii.     At the same time plaintiffs were plotting to drive Tuffcare out of the Puerto Rico

Graham Field, Inc., et. al., v. E 1 Enterprises Inc., et. al.,                    E1's Pre Trial Memo
98-1306 (DRD)

market, Irwin Selinger falsified documents to manipulate and inflate plaintiff's stock

price. Mr. Selinger also included false information in Graham Field's SEC Form 10-Q

for the quarter ended September 30, 1997.   On October 30, 2002 the United States

charged Mr. Selinger with securities fraud. Mr. Selinger was convicted on all charges.

3.      Contested issue of law, including evidentiary questions:

a.      *Law 75*:

i.      Law 75 was not intended to prevent termination of unworkable

relationships, but only to prevent arbitrary terminations. See <u>R.W. Int'l Corp. v. Welch

Food, Inc.</u>, 88 F.3d 49, 53 (1st Cir. 1996). (*Found "just cause" for termination when

a dealer sold competing products*.)

ii.      Puerto Rico's Law 75 governs the business relationship between

principals and the locally appointed distributors who market their products. See: <u>Irvine

v. Murad Skin Research Labs., Inc.</u>, 194 F.3d 313, 317-18 (1st Cir. 1999). In order to

avoid the inequity of arbitrary termination of distribution relationships once the

distributor has developed a local market for the principal's products or services, Law

75 limits the principal's ability to unilaterally end the relationship except for "just

cause." P.R. Laws Ann. tit. 10, § 278a. The protection afforded to distributors under

Law 75 was extended in 1996 to include the conduct of a principal "<u>detrimental to the

established relationship</u>." P.R. Laws Ann. tit. 10, § 278a. <u>Caribe Industrial System,</u>

Graham Field, Inc., et. al., v. E 1 Enterprises Inc., et. al.,                E1's Pre Trial Memo
98-1306 (DRD)

Inc. v. National Starch, 212 F.3d 26, 29 (1st Cir. 2000); see also Irvine, 194 F.3d at 317-

18.  **"Established relationship" being the operative words**.

      iii.     Not all commercial relationships are protected by Law 75. Rather, before

invoking the remedies provided by the statute, a court must first determine whether the

commercial relationship at issue constitutes a "dealer's contract" within the meaning of

§ 278(b).[1]  If there is no "dealer's contract," there is no Law 75 liability.  The first and

most important issue before this Court is whether or not there was a "dealer's contract"

between the parties. If there was none, then the case should be summarily dismissed.

      iv.     "The 'established relationship' between dealer and principal is bounded

by the distribution agreement, and therefore the Act only protects against detriments to

contractually acquired rights." (citation omitted). Vulcan Tools of Puerto Rico v.

Makita U.S.A., Inc., 23 F.3d 564, 569 (1st Cir. 1994).  If there has been no impairment

of the terms of the contract, there is no Law 75 liability. *Id.*

      v.     Although non-exclusive distributors are entitled to protection under Law

75, Law 75 does not operate to convert non-exclusive distribution contracts into

---

[1]

This Court has held before that Law 75 does not prevent a supplier from establishing a wholly-owned subsidiary as an additional distributorship in Puerto Rico where a non-exclusive distributor was already operating even if the existing distributor suffered an economic harm as a consequence of said action. Innovation Marketing v. Tuffcare. Inc., 31 F. Supp. 2d 218 (D. Puerto Rico 1998) (applying the holding in *Vulcan Tools* within a Law 21 context). A supplier is free to create a wholly-owned subsidiary to distribute products where a non-exclusive distributor already exists.

Graham Field, Inc., et. al., v. E 1 Enterprises Inc., et. al.,                    E1's Pre Trial Memo
98-1306 (DRD)

exclusive distribution contracts." <u>Borschow Hospital and Medical Supplies, Inc. v.</u>
<u>Cesar Catillo. Inc.</u>, 96 F.3d 10 (1st Cir. 1996) (citations omitted).  Law 75 protects
supplier-distributor relationships, but does not pamper distributors into acquiring rights
that they have never possessed to begin with.  <u>Caribe Industrial System, Inc. v. National</u>
<u>Starch</u>, 36 F. Supp. 448, 452 (D. Puerto Rico 1999).

      vi.     The Puerto Rico Supreme Court has further defined the dealer/principal
relationship as one of "continuity, stability, mutual trust, coordination between parties
as independent entrepreneurs, devoid of hierarchical subordination, and in whom
[plaintiff] has made a substantial investment."<u>Chemorganics, Inc., Kemwater North</u>
<u>America, Inc., et al.</u>, 49 F. Supp. 2d 62, 66 (D. Puerto Rico 1999) *citing* <u>J. Soler</u>
<u>Motors, Inc. v. Kaiser Jeep International Corp.</u>, 108 D.P.R. 134, 142 (1978).

      vii.    In light of the above-cited criteria we must then determine the following:
What was the agreement, if any, between plaintiff Graham Field and Tuffcare?  To
what products did the VC Agreement apply?  Was plaintiffs' promotion of its own line
of competing products detrimental to Tuffcare?

      viii.    Plaintiffs never endeavor to create a favorable market for Tuffcare's
product in Puerto Rico. Graham Field limited its activities to using defendant's product
for a brief transition period, in clear detriment of defendant's future position in the
market.  (*See:* <u>Chemorganics, Inc.  v. Kemwater North America, Inc.</u>, 49 F. Supp. 2d

62, 66 ( D. Puerto Rico 1999) (*J. Casellas found that plaintiff was not a "dealer"*

*because it limited its activities to selling defendant's product to its main competitor*

*on the Island, in clear detriment of defendant's future position in the market.*)

ix.    It is plaintiffs contention that the VC Agreement granted VC the

exclusive distributorship of <u>all</u> of Tuffcare's products.  Plaintiffs allege that the VC

Agreement "meant that Tuffcare would not sell It is the law of this Circuit that a

conflict of interest exists when a dealer sells competing products.  This conflict of

interest, if material to the principal, constitutes just cause for termination. <u>Welch Food,

Inc.</u>, 88 F.3d at 53.  It is undisputed that plaintiffs sold competing products.

x.    Plaintiffs argue that the August 27, 1996 "non exclusive *arrangement*"

allowed GFE to sell its own competing products in Puerto Rico while <u>at the same time</u>

provided them with the exclusive distribution rights of Tuffcare's products in Puerto

Rico (thus, forbidding Tuffcare from selling its own products in Puerto Rico).  GFE's

conflict of interest is crystal-clear.  Law 75 does protect a relationship where one party

can sell competing products and at the same time prevent its competitor from directly

selling its own products.  If this were allowed, the first company could destroy the

business of the second company.  This should be the end of plaintiffs' Law 75 claim.

xi.    Considering that the dealer-distributor relationship is "characterized by

the cooperation, stability, and mutual trust it generates," plaintiffs' behavior could

Graham Field, Inc., et. al., v. E 1 Enterprises Inc., et. al.,                    E1's Pre Trial Memo
98-1306 (DRD)

hardly reflect such a relationship.  Plaintiffs' attempt to promote its own competing

lines at Tuffcare's expense goes against the very essence of a dealer - distributor

relationship.  Although no single factor is deemed to be conclusive, both the creating

of a favorable market and the gaining of consumers for a product or a service, have

been regarded as the two most salient criterion in identifying a dealer under § 278.

Triangle Trading Co. v. Robroy Industries Inc., 952 F. Supp. 75, 77 (D.P.R. 1997).  It

is impossible to imagine how plaintiff's promotion of its own line of competing

products & plot to stop buying from Tuffcare would support a finding that a

relationship of "mutual trust" existed between the parties.

b.    ***Robinson Patman***

     i.    The purpose of the anti trust statutes "is not to protect business from the

working of the market; it is to protect the public from the failure of the market.  The

law directs itself not against conduct which is competitive, even severely so, but against

conduct which unfairly tends to destroy competition itself." [Emphasis added.]

Spectrum Sports v. McQuillan, 508 U.S. 447 (1993).  Thus, the Supreme Court has

been "careful to avoid constructions of [anti trust statutes] which might chill

competition, rather than foster it."  *Id.*

     ii.    Count I of plaintiffs' *second* amended complaint alleges a Robinson

Patman violation.  In Count I Plaintiffs aver that Tuffcare's discriminatory pricing

Graham Field, Inc., et. al., v. E 1 Enterprises Inc., et. al.,                    E1's Pre Trial Memo
98-1306 (DRD)

practices began *after* MedEx was organized.[2] Count I did not include any allegations

of price discrimination for the time period *before* MedEx was organized.  MedEx was

organized in November 24, 1997.

       iii.    Plaintiffs then argue that in the *post* MedEx time period Tuffcare

engaged in discriminatory pricing against Plaintiffs for the T-2000 bed.  The only item

for which Plaintiffs *specifically* alleged price discrimination is the T-2000 bed. Count

I anti trust violation is then formulated as follows: Plaintiffs argue a Robinson Patman

violation based on the *actual* transfer prices between Tuffcare and MedEx and the

prices *quoted* to GFE.[3]  They also argue a Robinson Patman violation based on

Tuffcare's *refusals to sell* the T-2000 bed to GFE.[4]

       iv.    Section 2(a) of the Robinson Patman Act, 15 U.S.C. § 13(a), establishes

a number of jurisdictional or threshold requirements that must be met **before**

---

    [2]     *After* Med Ex was set up "as a Tuffcare distributor in Puerto Rico, Tuffcare discriminated against Plaintiffs, and in favor of MedEx..." (See: ¶ 40, *Second* Amended Complaint, Docket No. 155.)

    [3]     "...the prices that Tuffcare charged to MedEx to purchase a key Tuffcare product, a semi electric bed, called the T-2000, at little more than one-half the price that Tuffcare **quoted** to Plaintiffs for this product." (See: ¶ 41, *Second* Amended Complaint, Docket No. 155.) (Emphasis added.)

    [4]     "Commencing in the last quarter of 1997, and continuing thereafter, when Plaintiffs sought to purchase this product, *i.e.*, the T 2000 semi electric bed, or other Tuffcare products, Tuffcare **refused** to sell this product, and its other products to Plaintiffs."   (Italics in the original.) (Emphasis added.)

consideration of the substantive charge of competitive injury can be undertaken.  The statute requires **two or more** consummated sales in interstate commerce of commodities of like grade and quality made at discriminatory prices by the same person ("single seller") **to two or more purchasers** within the approximate time period.[5]

v.    Stated as succinctly as possible, plaintiffs' failed to meet the two different purchasers jurisdictional requirement established by Section 2(a) because during the *post* MedEx time period there was only **one** Robinson Patman "purchaser;" MedEx.

vi.    First, Plaintiffs cannot claim that they suffered discriminatory pricing during the 1996 - 1997 time period because the alleged favored buyer (i.e. MedEx) did not exist at that time.  Similarly, they cannot claim Robinson Patman damages because after 1998 they were not a Robinson Patman "purchaser."  *(Plaintiffs do not argue that they actually bought commodities from the Defendant after 12/97; the post MedEx period.  Instead, they argue that they could not or chose not to.)*

---

[5]

Section 2(a) of the Robinson Patman Act, 15 U.S.C. § 13(a), provides, in pertinent part:

It shall be unlawful for any **person** engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between **different purchasers** of commodities of like grade and quality, ... and where the effect of such discrimination **may be substantially to lessens competition or tend to create a monopoly** ... [Emphasis added.]

Graham Field, Inc., et. al., v. E 1 Enterprises Inc., et. al.,                    E1's Pre Trial Memo
98-1306 (DRD)

      vii.    For there to be a Robinson Patman violation there must be actual "sales to competitors at disparate prices." Mere quotes or refusals to sell are insufficient. Section 2(a) of the Robinson Patman Act, 15 U.S.C. § 13(a), is again our starting point:

*... And provided further*, That nothing herein contained shall prevent persons engaged in selling goods, wares, or merchandise in commerce from selecting their own customers ... [Emphasis added.]

      viii.    Section 2(a) applies only when there at least two completed sales by the same seller at different prices to different purchasers. See, e.g. <u>Bruce's Juices, Inc. V. American Can Co.</u>, 330 U.S. 743 (1947). Thus, a mere offer of sale is not sufficient. See, e.g., <u>Robertson's Battery Terminal, Inc. V. Pacific Chloride, Inc.</u>, 961 F.2d 1578 (6th Cir. 1992) (*Different price quotes to different parties for use in bidding did not violate the act because neither bid was chosen; thus, no "sale" occurred*).

      ix.    Therefore, the initial and dispositive question on the present claim is whether Plaintiffs were the defendant's "customer" or "purchaser" within the meaning of Sections 2(a) after MedEx was created. *See e.g.* D. Baum, <u>The Robinson-Patman Act: Summary and Comment</u>, p. 53 et. seq. (1964).

      x.    The classic and accepted definition of the term "purchaser" (or "customer") is found in <u>Shaw's, Inc. v. Wilson-Jones Co.</u>, 105 F.2d 331, 333 (3rd Cir. 1939), wherein the Third Circuit stated:

The term purchaser means simply one who purchases, a buyer, a vendee. It does

Graham Field, Inc., et. al., v. E 1 Enterprises Inc., et. al.,                    E1's Pre Trial Memo
98-1306 (DRD)

not mean one who seeks to purchase, a person who goes into the market-place for the purpose of purchasing. In other words, it does not mean a prospective purchaser, or one who wishes to purchase...

xi.    Plaintiffs in their complaint lay emphasis in their allegation that the defendant discriminated against it by **quoting** higher prices for the same products, offering better credit terms to MedEx than those offered to Plaintiff <u>had it purchased those products</u>. (*See* ¶*'s* 39 - 42, 44 of the *Second* Amended Complaint; Docket No. 155.)

xii.    Since two completed sales are required for Robinson Patman jurisdiction, refusals to sell or to continue to sell do not constitute an actionable discrimination.  See, e.g., <u>Shaw's Inc. v. Wilson Jones Co.</u>, 105 F.2d 331 (3rd Cir. 1939).  The Courts have found this limit on the reach of the Act to be required by both <u>United States v. Colgate Co.</u>, 250 U.S. 300 (1919), which protects the right of one to unilaterally refuse to deal (the *Colgate* doctrine), and by the Section 2(a) proviso that reserves to sellers the right of "selecting their own customers in bona fide transactions and not in restraints of trade." <u>FTC v. Simplicity Pattern Co.</u>, 360 U.S. 55, 66 (1959).

xiii.    "The right to refuse to deal, the statutory embodiment of the 'Colgate Doctrine,' permeates the entire Robinson-Patman Act. One who is not a customer cannot claim the allowance or services which flow from Sections 2(d) and (e)." D. Baum, *supra* at 53.

Graham Field, Inc., et. al., v. E 1 Enterprises Inc., et. al.,                    E1's Pre Trial Memo
98-1306 (DRD)

xiv.    Finally, a statement relevant to the matter at bar can be found in <u>Naifeh</u>

<u>v. Ronson Art Metal Works</u>, 218 F.2d 202, 206 - 7 (10 Cir. 1954).[6]

By the express terms of the Act, [defendant] had the right to do business with whom
it pleased. As a private trader in interstate commerce, [defendant] not only could select
its own customers but also could refuse to sell its merchandise to anyone and by so
doing would in no way violate the anti-trust laws. It is settled law that a seller may
either refuse to negotiate or may cease doing business with a customer without running
afoul of the Act. . . .

xv.    The complaint does not sufficiently allege conduct on the part of the

defendant which is proscribed by the Act. It merely alleges that defendant stopped doing

business with plaintiff and continued to do business with others (MedEx). "And termination

of one distributor in favor of another has been upheld as perfectly lawful and not in restraint

of trade under the Clayton Act as amended by the Robinson-Patman Act. *New Amsterdam*

*Cheese Corp. v. Kraftco Corp., 363 F. Supp. 135 (S.D.N.Y. 1973).*" <u>Monroe Co. of</u>

<u>Quincy v. American Standard, Inc.</u>, 368 F. Supp. 603, 605 (D. Mass. 1973). (See also:

<u>Jobbers Warehouse Service, Inc. v. Maremont Corp.</u>, 453 F. Supp. 840 (Mass. 1978).

(*Absent a contrary agreement, a manufacturer may choose distributors at will.*))

---

6

See also, <u>Colorado Pump & Supply Co. v. Febco, Inc.</u>, 472 F.2d 637, 641 (10 Cir.) cert. denied, 411
U.S. 987 (1973); <u>New Amsterdam Cheese Corp. v. Kraftco Corp.</u>, 363 F. Supp. 135, 141-142
(S.D.N.Y. 1973); <u>Tripoli Co. v. Wella Corp.</u>, 286 F. Supp. 264 (E.D. Pa. 1968), aff'd, 425 F.2d 932
(3 Cir.) cert. denied, 400 U.S. 831 (1970); <u>Ben B. Schwartz & Sons, Inc. v. Sunkist Growers, Inc.</u>, 203
F. Supp. 92, 99 (E.D. Mich. 1962).

Graham Field, Inc., et. al., v. E 1 Enterprises Inc., et. al.,                    E1's Pre Trial Memo
98-1306 (DRD)

    c.    ***Robinson Patman - Single Seller***

    i.    Plaintiff's relevant factual allegations included in Count II (anti trust) of its *first* Amended Complaint[7] state that (1) MedEx Corporation (not included as a defendant) is wholly controlled by Tuffcare, and (2) for purposes of the Robinson-Patman Act, Tuffcare and MedEx should be considered a single seller.[8]

    ii.    Plaintiffs' Robinson Patman Act is based on a comparison of comparing transfer prices between Tuffcare and MedEx to prices <u>offered</u> by Tuffcare to Graham Field Express.[9] Such comparison is incorrect pursuant to <u>Caribe BMW v. BMWA, et. al., 19 F.3d 745</u>, (1st Cir. 1994).

    iii.    Since plaintiffs recognized in their count two allegations that Tuffcare and MedEx are indeed a "single seller" (due to Tuffcare's control over MedEx's pricing and distribution policies, accounting & management) transfer prices between Tuffcare and

---

[7]

Once the appearing defendant filed its *Motion to Dismiss* (See Docket # *132),* plaintiffs, moved to file a *second* amended complaint to remove the single seller allegations. A vain attempt to defeat our *Motion to Dismiss.* However, their prior admissions of fact remain pertinent to their Robinson Patman claim. After all, the facts admitted the parties themselves constitute the law of the case for all legal purposes. <u>Jordan v. Kelley</u>, 728 F.2d 1 (1st Cir. 1984); <u>Brooks Village North Associates v. General Electric Co.</u>, 686 F.2d 66 (1st Cir. 1982); <u>Chart House Inc. v. Bornstein</u>, 636 F.2d 9 (1st Cir. 1980).

[8]

See *first* Amended Civil Action Complaint, paragraph 64.

[9]

See *first* Amended Civil Action Complaint, paragraph 64. See also plaintiffs' *Second* Amended Civil Action complain, paragraph 44.

Graham Field, Inc., et. al., v. E 1 Enterprises Inc., et. al.,                    E1's Pre Trial Memo
98-1306 (DRD)

MedEx are irrelevant for Robinson Patman purposes.

iv.    We first turn to the facts brought forth by the plaintiffs to sustain their

Robinson - Patman Act claim:

(1)    [Defendant] Tuffcare has established its own organization, ...

controlled by it, in Puerto Rico.  That entity is called MedEx or MedEx

Corporation. [Emphasis added.]  (See ¶ 62 of the *first* Amended Civil Action

Complaint.)

(2)    Tuffcare is selling goods in Puerto Rico and Tuffcare/MedEx is

now serving as the only distributor for Tuffcare in Puerto Rico.  For purposes

of the Robinson-Patman Act, Tuffcare and MedEx are a "single seller".

[Emphasis added.] (See ¶ 63 *first* Amended Civil Action Complaint.)

(3)    Tuffcare/MedEx is a direct competitor with Plaintiffs, selling the

same goods to the same kinds of customers and, in fact, the identical customers

as to whom Plaintiffs sell their products. (See ¶ 64 of the *first* Amended Civil

Action Complaint.)

(4)    Tuffcare has given to Tuffcare/MedEx better prices on the same

goods it has sold to Plaintiffs: it has given Tuffcare/MedEx access to a broader

range of products than it has given to Plaintiffs; it has given Tuffcare/MedEx

Graham Field, Inc., et. al., v. E 1 Enterprises Inc., et. al.,                    E1's Pre Trial Memo
98-1306 (DRD)

better payment terms and in other aspects of sale it has favored Tuffcare/MedEx

over Plaintiffs. (See ¶ 66 *first* Amended Civil Action Complaint.)

(5)     Upon information and belief there had been multiple sales by

Tuffcare/MedEx to customers here in Puerto Rico of goods that had been sold

by Tuffcare to Tuffcare/MedEx at a price below, and/or on payment terms better

for Tuffcare/MedEx than, those accorded to Plaintiffs. (See ¶ 68 *first* Amended

Civil Action Complaint.)

v.     Throughout the case it has been Plaintiffs' legal theory that "MedEx was

merely a tool used by the Defendant.  The Defendant totally controlled MedEx."  (*See:*

*page 241.5 of Exhibit 20: Plaintiffs' Supplemental Response to Defendant's First*

*Interrogatory*.)  We include the following statements as a brief example:

(1)     5/20/99: *Plaintiffs' Motion for an Order of Contempt*: In

Plaintiffs' Motion for Contempt they refer to sales between Tuffcare and

MedEx as "intra-company transfers." (*See Exhibit 20: page 241 of Exhibits*.)

(2)     4/14/00: *Plaintiffs' Statement of Material Facts*:  In Plaintiffs'

Statement of Material Facts they again refer to sales between Tuffcare and

MedEx as "intra-company transfers." (*See Exhibit 20: page 243 of Exhibits*.)

(3)     8/5/02:*Plaintiff's Supplemental Response to Defendant's First*

Graham Field, Inc., et. al., v. E 1 Enterprises Inc., et. al.,                    E1's Pre Trial Memo
98-1306 (DRD)

*Interrogatories*: Plaintiffs' supplemental responses to our first set of interrogatories are dated August 5, 2002. In it, Plaintiffs make the following remarks regarding the relationship between Tuffcare and MedEx:

> (a)    Page 12: "MedEx was merely a tool used by the Defendant. The Defendant totally controlled MedEx."(*See Exhibit 20: page 241.5 of Exhibits.*)

> (b)    Page 32, ¶ 83: "Defendant shipped Products to MedEx as intra-company transfers." (*See Exhibit 20: page 241. 7 of Exhibits.*)

> (c)    Page 34, ¶ 91: "During ... the entire period that MedEx has been operating, MedEx has been controlled by the Defendant. The prices that MedEx charged to potential customers was set by Calvin Chang, the Vice-President of sales for the Defendant, and the CEO of MedEx, set the prices at which Defendant invoiced MedEx, and he set the prices that MedEx charged customer for Defendant's products."

vi.    Thus, plaintiff's claim hinges on (1) whether on not sales from Tuffcare to MedEx constitute a "sale" for Robinson Patman purposes and (2) whether or not MedEx is a "purchaser" for Robinson Patman purposes.

vii.    <u>Thus, the legal question is whether or not transfers of commodities</u>

Graham Field, Inc., et. al., v. E 1 Enterprises Inc., et. al.,                    E1's Pre Trial Memo
98-1306 (DRD)

between two affiliates that constitute a "single seller" also constitute a "purchase" for

Robinson-Patman Act purposes.

      viii.    The answer lies in Caribe BMW v. BMWA, et. al., 19 F.3d 745, 750 -

751, (1st Cir. 1994) the First Circuit held that  that sales of commodities between two

corporations that constitute a "single seller" do not constitute "sales" for Robinson

Patman purposes, but should instead be considered as inter-company transfers.  As

such, "transfers" between the single seller cannot be added up to meet the two or more

sales requirement by the same person at different prices to different customers.  See Id.

at 748.

      ix.    The First Circuit had to determine whether or not these two separately

incorporated companies constituted a "single seller" for Robinson Patman purposes.

If not, the District Court was correct in dismissing the complaint since there was no

"person" who had discriminated, since discrimination requires at least two sales by a

single person at different prices to different customers in competition with each other.

See Id. at 748.  (If co defendants were not a single person, then one could not be held

liable for the acts of the other.  Thus, Caribe BMW could not base its Robinson Patman

claim against BMW AG on the prices granted to its competitors by BMW NA, a

different person.)

x.    The First Circuit held that BMW NA and BMW AG were indeed a single seller and that the complaint properly alleged that a "single person" had sold similar goods at two different prices   (reversing the District Court's dismissal of the complaint).

xi.    To reach its conclusion the First Circuit expanded the general postulate of antitrust law that substance and true competitive function control, rather than corporate form. *See*: Security Tire & Rubber Company v. Gates Rubber, 598 F.2d 962, 965 (5th Cir. 1979).  In *Caribe BMW* the First Circuit recognized that previous "single seller" cases had been decided on the issue of control.  That is, if one corporation controls the pricing and distribution policies of another, then they are both considered a "single seller" for purposes of the Robinson Patman Act. In *Caribe BMW* the First Circuit went further.

xii.    The First Circuit decided that case specific "control" inquiries were no longer necessary when a court had to determine whether or not a parent corporation and its wholly owned subsidiary amount to a "single seller."  The First Circuit provided a blanket rule by which a corporation and it's wholly owned subsidiary will always be considered as a "single seller" for Robinson Patman purposes. However, the issue of control over pricing and distribution policies that one corporation exerts over a non subsidiary (i.e. an affiliate) will be the determining factor to determine if those two

corporations amount to a "single seller."

xiii.    We now apply to the First Circuit's holding in *Caribe BMW* to the allegations included in Count Two of the amended civil action complaint.

xiv.    For purposes of clarity, we first pause to identify the "hypothetical entities" used by the *Caribe BMW* court (*See:* 19 F.3d at 749) to illustrate its holding (*See:* 19 F.3d at 751) and tie them in to the parties in this case.

xv.    The First Circuit identified the hypothetical entities as follows:   1) the manufacturer (M),  2) its wholly controlled distributor (D), 3) the retailer (R1) who buys directly from D and 4) the direct buying retailer (DBR) who buys directly from M and resells in the retail market.  *Id*. at 749.

xvi.    In our case, Tuffcare holds the position of M; MedEx the position of D, plaintiff Graham Field Express the position of DBR and MedEx's and Graham Field's retail customers, the position of R1.

xvii.    The First Circuit held that D (MedEx), the transferee, is not a "purchaser" from M (Tuffcare), and for that reason, M (Tuffcare) does not violate the Act even if it sells the same commodity to a direct buying retailer ("DBR") (Graham Field Express), even if the DBR is a direct competitor of D, at a higher price than at which he "transfers" the good to D (MedEx).  That holding means that when D

Graham Field, Inc., et. al., v. E 1 Enterprises Inc., et. al.,                    E1's Pre Trial Memo
98-1306 (DRD)

(MedEx) resells the good to the R1 (retailers), it must do so at a "nondiscriminatory"

price, i.e., at a price that would be permissible under the Robinson Patman Act had D's

sale to R1 been made by M (Tuffcare).  Thus, if M (Tuffcare) sells to DBR (Graham

Field Express) at 14, D (MedEx) cannot sell to R1 (retailers) for less that 14.  (*See:*

Caribe BMW, 19 F.3d at 751.)

xviii.   It should be clear from this example that pursuant to *Caribe BMW* the

sales that must be compared to each other to determine any violation to the Robinson

Patman Act are sales from Tuffcare (M) to Graham Field Express (DBR) v. sales by

MedEx (D) to retailers (R1).

xix.   Instead, plaintiffs are using the wrong comparison.   Plaintiffs are

comparing transfer prices between Tuffcare (M) and MedEx (D) with prices offered

by Tuffcare (M) to Graham Field Express (DBR).  (See ¶ 68 of the *first* Amended Civil

Action Complaint.)   Mistakenly, plaintiffs have based their whole case on the

commodity transfers between Tuffcare and MedEx.

xx.   To fully appreciate this holding, we must keep in mind that the Robinson

Patman Act is really referring to the effect of competition and not merely upon

competitors.  In this respect, §2(a) must be read in conformity with the public policy of

preserving competition, it is not concerned with mere shifts of business between

competitors. It is concerned with substantial impairment of the vigor or health of the

contest for business, regardless of which competitor wins or loses. (*See*: <u>Anheuser

Busch v. FTC</u>, 289 F.2d 835 (7th Cir. 1961)) The Act is not concerned in shifts in profits

between affiliates Tuffcare and MedEx (a higher transfer cost = more profits for

Tuffcare, less to MedEx), but whether or not Tuffcare sells to Graham Field at a non

discriminatory price (i.e. the same price by which MedEx sells to its customers in

Puerto Rico. Everyone in Puerto Rico should get R1 prices.)

    xxi.    By deciding that the relevant comparison will be the sales between

MedEx (D) and its Puerto Rico retailers (R1) to sales from Tuffcare (M) to Graham

Field Express (DBR), the First Circuit made a policy statement.

    xxii.    The First Circuit thought that there is a greater danger to "competition"

if it allowed a manufacturer (M) to set up a "distributor" to sell to disfavored customers

(R1) at $12, while at the same time selling directly to a favored customer (DBR) at

$10. "M" should not be able to defeat the law by setting up an independent "D", to

whom it sells at $10, knowing that "independent "D" will "independently" resell to R1

at $12. <u>Caribe BMW</u>, 19 F.3d at 750. The First Circuit was concerned that by making

transfer prices between "M" and "D" the relevant inquiry, it would allow a

manufacturer (Tuffcare) to "defeat the statute's clear objectives by transforming

unlawful, into lawful, price discrimination through the creation of a separately

Graham Field, Inc., et. al., v. E 1 Enterprises Inc., et. al.,          E1's Pre Trial Memo
98-1306 (DRD)

incorporated subsidiary 'distributor' that sells to the disfavored customers." <u>Caribe</u>

<u>BMW</u>, 19 F.3d at 750.

4.      Proposed stipulations:

a.      In October 1990 Tuffcare and VC Medical entered into a distribution agreement

("VC Agreement").

b.      The VC Agreement was signed by Calvin Chang representing Tuffcare and Mr.

Vicente Guzman and Mrs. Hilda Salgado representing VC Medical.

c.      The VC Agreement was limited to wheelchairs.  That meant that VC Medical

did not sell competing wheelchairs and Tuffcare did not market its wheelchairs through

any other company in Puerto Rico.

d.      VC also purchased other products on a non-exclusive basis.

e.      VC Medical never purchased beds from Tuffcare.

f.      VC Medical bought beds from Graham Field.

g.      IN 1996 plaintiff Graham Field entered into negotiations with VC Medical to

purchase all of VC's assets and set up its own distributor in Puerto Rico.

h.      In order for the sale to take place Graham Field requested from VC Medical

that it renegotiate the VC Agreement.

Graham Field, Inc., et. al., v. E 1 Enterprises Inc., et. al.,                    E1's Pre Trial Memo
98-1306 (DRD)

      i.      As it stood, the VC Agreement would prevent Graham Field from introducing its competing Celtylite and Everest & Jennings wheelchairs.

      j.      VC Medical and Tuffcare terminated the VC Agreement by letter dated August 13, 1996.

      k.      Pursuant to that letter, Tuffcare agreed to a non-exclusive arrangement whereby it would continue selling its products to VC Medical on a non exclusive basis.

      l.      At the time Mr. Guzman sold his corporation to GFE, there was no exclusive agreement of sales between VC Medical and Tuffcare.

      m.      On August 27, 1996 Tuffcare consented to the assignment of the non-exclusive arrangement with VC Medical to GFE.

5.      Names and addresses of all witnesses the parties intend to call at trial.

      a.      Vicente Guzman

      b.      Hilda Salgado

      c.      Calvin Chang

6.      Documents to be offered as evidence at trial:

      a.      Exclusive Sales Agreement.

      b.      August 13, 1996 termination of the Sales Agreement.

Graham Field, Inc., et. al., v. E 1 Enterprises Inc., et. al.,                    E1's Pre Trial Memo
98-1306 (DRD)

c.    August 17, 1996 letter by Vicente Guzman requesting the assignment of

Distribution Agreement.

d.    August 27, 1996 letter by Calvin Chang re: assignment of the non exclusive

arrangement to GFE.

e.    December 3, 1997 memo from Vicente Guzman to Irwin Selinger.

f.    September 23, 1997 memo from Vicente Guzman to Irwin Selinger.

g.    September 23, 1997 Fax transmittal from Irwin Selinger to Vicente Guzman.

h.    July 16, 1997 memo from Irwin Selinger to Vicente Guzman.

i.    May 12, 1997 letter from Vicente Guzman to Peter Wincour.

7.    Brief statement as to what each trial witnesses' testimony.

a.    Vicente Guzman:

i.    He will testify as to the nature of the VC Agreement and the non-

exclusive arrangement between Tuffcare and GFE.   He will explain that the VC

Agreement was limited to wheelchairs.   Although VC Medical purchased other

products from Tuffcare, it was done on a non-exclusive basis.   As to beds, VC Medical

never purchased beds from Tuffcare.   Instead, VC would purchase its beds from

Graham Field.

Graham Field, Inc., et. al., v. E 1 Enterprises Inc., et. al.,          E1's Pre Trial Memo
98-1306 (DRD)

ii.     Mr. Guzman will also testify as to the asset purchase agreement between

VC and Graham Field and the subsequest relationship bewteen plaintiffs and Tuffacre.

He will testify that in 1996 plaintiff Graham Field entered into negotiations with VC

Medical to purchase all of VC's assets and set up its own distributor in Puerto Rico.

However, in order for the sale to take place, plaintiff Graham Filed demanded from VC

Medical that it renegotiate the VC Agreement.   The reason was that the VC

Agreement, as it stood, would prevent Graham Field from introducing its competing

Celtylite and Everest & Jennings wheelchairs.

iii.     Towards that end, Tuffcare and VC Medical **terminated** the VC

Agreement by letter dated August 13, 1996.  The letter specifically stated that they

thereby "terminate[d] the Exclusive Sales Agreement between VC Medical Distributors

and Tuffcare signed in October 1990. Both company (*sic.*) will continue to do business

at goodwill." He will explain that Tuffcare agreed to sell the same products to Graham

Field as before, but not on an exclusive basis ("the non exclusive *arrangement*").

iv.     He will also testify as to plaintiffs' 1997 purchase of the wheelchair

manufacturer Everest & Jennings and plaintiffs startegy to drive Tuffcare out of the

Puerto Rico market.  Before Graham Field purchased Everest & Jennings, Tuffcare's

wheelchair price was lower that what Mr. Guzman could otherwise get. However, once

GFE had Everest & Jennings wheelchairs available for sale, he was going to start using

Graham Field, Inc., et. al., v. E 1 Enterprises Inc., et. al.,                    E1's Pre Trial Memo
98-1306 (DRD)

them and stop buying Tuffcare wheelchairs.

v.    Mr. Guzman will testify that after the Everest & Jennings purchase he
was ordered by plaintiffs' legal counsel, Mr. Richard Kolodny, and by plaintiffs'
president, Irwin Selinger, to decrease GFE's purchases of Tuffcare products until a
short transition brought an immersion of Graham Field products into the Puerto Rico
market.  At that point, all of Tuffcare purchases would cease.

vi.    GFE kept purchasing Tuffcare products in a transition period, and only
as a back up, whereupon GFE bought less and less from Tuffcare for three main
reasons:

(1)    Provide enough competition free time while GFE introduced into
the Puerto Rico market competing lines from Graham Field, such as the Everest
& Jennings wheelchairs;

(2)    Convince Tuffcare that it did not need to establish a direct
distribution in Puerto Rico of its products;

(3)    Need to supply with other manufacturer's products due to
Graham Field's inadequacy in filling GFE's orders completely and on time.

vii.    He will also testify as to how he was was <u>chastised</u> on several occasions
by Mr. Irwin Selinger (Graham Field's president) and Mr. Richard Kolodny (Graham

Field's general counsel) for buying Tuffcare products.

viii.    In a July 16, 1997, Mr. Irwin Selinger wrote a memo to Mr. Guzman wherein he stated that "there is no reason to buy Tuffcare Wheelchairs when we own E & J [Everest & Jennings] ... Please make sure that your entire staff abides by this memo." Mr. Guzman will testify that he understood this as an instruction to stop buying all wheelchairs from Tuffcare

b.    Hilda Salgado:

i.    She will testify that VC was the exclusive distributor for Puerto Rico of Tuffcare's wheelchairs. The "exclusivity was **only** for the distribution of **wheelchairs**. The dual exclusivity agreement was that Tuffcare would only sell to VC Medical the product line of wheelchairs and VC would not buy wheelchairs from any other manufacturer.  VC also purchased from Tuffcare canes and walkers, and related products on a **non-exclusive basis**."

ii.    VC Medical never received beds from Tuffcare.  VC Medical only purchased and promoted beds from other manufacturers, including but not limited to Plaintiff  Graham Field, Inc.

iii.    She will also testify that after the asset sale to GFE, Calvin Chang complained to her that GFE was not buying enough Tuffcare products and was late

Graham Field, Inc., et. al., v. E 1 Enterprises Inc., et. al.,                    E1's Pre Trial Memo
98-1306 (DRD)

paying their invoices. When Ms. Salgado told Mr. Guzman about Tuffcare's

complaints, Mr. Guzman stated that **GFE could not buy anymore of Tuffcare's beds**

**or wheelchairs because Graham Field had its own factories** (for competing

products).

c.      Calvin Chang:

i.      Mr. Chang will testify that as to the nature of the VC Agreement: VC

Medical would only buy wheelchairs from Tuffcare, and Tuffcare would only sell its

wheelchairs in Puerto Rico through VC Medical. This exclusiveness didn't relate to

other products. It was limited to wheelchairs. The dual exclusivity agreement was that

Tuffcare would only sell to VC Medical the product line of wheelchairs and VC

Medical would not buy wheelchairs from any other manufacturer.

ii.     What was important to Tuffcare is that its distributor (in this case

wheelchairs) did not carry competing products.

iii.    He will also testify that VC Medical purchased and promoted beds from

other manufacturers and never bought beds from Tuffcare.

iv.     On several occasions Mr. Chang expressed his concern to Mr. Guzman

of how GFE was going to keep on selling Tuffcare products as the first product of the

company if the company manufactured Everest & Jennings wheelchairs. And it was

Graham Field, Inc., et. al., v. E 1 Enterprises Inc., et. al.,                    E1's Pre Trial Memo
98-1306 (DRD)

understood that Graham Field wanted to market Everest and Jennings.  *(i.e. Plaintiffs'*

*conflict of interest.)*

8.    Expert Witness:

        i.     Dr. Elias Gutierrez.  Dr. Gutierrez will testify as to plaintiffs' failure to

prove any type of price discrimination.

9.    Claims or defenses deemed waived: None.

10.   Pending motions: E1's motion for the Court to consider the need of the Second

Amended Complaint.

11.   Estimated number of days for E1 to present its case: 2.

12.   Suggested trial date: At least 30 days from the pre trial date as required by Local Civil

Rule 16(d).

RESPECTFULLY SUBMITTED.

    Hato Rey, Puerto Rico, December 13, 2003.

                    /S/ Ignacio Fernandez de Lahongrais

                    IGNACIO FERNANDEZ DE LAHONGRAIS

                    USDC - PR 211603

                    Capital Center Sur, Suite 202

                    239 Avenida Arterial Hostos

                    Hato Rey, Puerto Rico 00918-1475

                    Tel. 787-758-5789 Fax 787-754-7504